## THE STATE v. HAMEY, Appellant.

### In Banc, March 29, 1902,

1. **Reversal in Division Two:** TRANSFER TO BANC: DISCHARGE.   Where the judgment against defendant in a criminal case, has, on his appeal, been reversed by a majority of Division Two, one judge dissenting, the case on motion of the Attorney-General may be transferred to the Court in Banc, and the defendant is not by reason of such reversal discharged.   The transfer is not an appeal on the part of the State, but simply a transfer to the whole court upon compliance with conditions prescribed by the Constitution, which expressly provides that such transfer may be made under such circumstances.

2. **Trial by Jury:** FIXING PUNISHMENT AT COMMON LAW. At common law the jury did not have the right to assess the punishment of the prisoner if they convicted him; on the contrary, their verdict was guilty or not guilty, and the court fixed the punishment according to the law in force.

3. ————: FIXING PUNISHMENT BY COURT: MEANING OF "TRIAL BY IMPARTIAL JURY OF COUNTY." The words of the Constitution of 1875 (sec. 22, art. 2), which guarantee the accused in all criminal prosecutions "a speedy, public trial by an impartial jury of the county," do not mean that a statute which authorizes either court or jury to assess the punishment in a felony case, is unconstitutional. But these words mean that accused is entitled to a trial by jury, with every common-law incident and protection, which are: first, a jury of twelve men indifferent between the prisoner and the commonwealth; second, the jury must be summoned from the vicinage where the crime is supposed to have been committed; third, the jury must unanimously concur in the verdict; and, fourth, the jury must be left free to act according to the dictates of their own judgment.

4. ————: ————: ————: "TRIAL AS HERETOFORE ENJOYED:" CARNAL KNOWLEDGE STATUTE: "IN THE DISCRETION OF THE COURT." As the right and the duty devolved upon the court at common law to assess the punishment, the statute (sec. 1838, R. S. 1899) providing that carnal knowledge with an unmarried female between the ages of fourteen and eighteen years, of previous chaste character, shall be deemed a felony and may be punished by imprisonment in the penitentiary not longer than two years, or in the county jail not longer than six months, or by a fine, "in the discretion of the court," is not violative of that part of the Constitution which guarantees the accused in all criminal prosecutions "a speedy public trial by an impartial jury of the county," nor of that other provision which says that "the right of trial by jury as heretofore enjoyed shall remain inviolate." (SHERWOOD and MARSHALL, JJ., dissenting.)

5. ————: ————: "TRIAL AS HERETOFORE ENJOYED." The *right* to have the punishment fixed by the jury was not secured by that language in the Constitution of 1875, which provided that "the right to trial by jury as heretofore enjoyed shall remain inviolate," simply because for many years prior to 1875 the *duty* of assessing the punishment had been imposed by statute upon the jury when they convicted a defendant. That duty was imposed by a legislative and not a constitutional enactment, and being legislative it could have been repealed at any time. These words must

State v. Hamey.

be held to refer to the essentials of a jury trial as they existed when the Constitution was adopted, which were the essentials of the common law as set out in syllabus 3. The fixing of the punishment being a non-essential incident of a jury trial, it was left to the Legislature to determine whether the court or the jury should fix the quantum of punishment. (SHERWOOD and MARSHALL, JJ., dissenting.)

6. ————: ————: ALTERNATIVE PUNISHMENTS GENERALLY. There is nothing in the Constitution of 1875 which requires the General Assembly to forever perpetuate the statutes requiring juries to fix punishment where alternate punishments are prescribed.

7. ————: ————: STATUTE CONCERNING CARNAL KNOWLEDGE: SPECIAL LAW. The statute (sec. 1838, R. S. 1899) making it a felony to have carnal knowledge with an unmarried female between fourteen and eighteen years of age, of previously chaste character, and assessing the punishment at two years' imprisonment in the penitentiary or six months in jail or at a fine "in the discretion of the court," is not a special law. It operates equally upon all who violate its provisions and in every county of the State and establishes one mode of punishment for all.

8. ————: ————: ————: PUNISHMENT ASSESSED BY JURY: EFFECT. The fact that the jury assessed the punishment for a violation of the carnal knowledge statute which says the punishment shall be assessed "in the discretion of the court," does not vitiate the verdict. The court could have ignored it and assessed the punishment itself, and must be held to have done so, by adopting it, and rendering judgment itself.

9. Admissions: ERROR AT DEFENDANT'S INSTIGATION. Defendant can not complain of admissions of prosecutrix made to a third party, if drawn out by himself.

10. Carnal Knowledge: CONSENT: RAPE: FORCE: MERGER. The statute making it a felony for a male over sixteen years of age to have carnal knowledge with an unmarried female of previously chaste character between the ages of fourteen and eighteen years, makes no distinction between sexual intercourse with or without consent, or with or without force. Nor can the defendant escape if the evidence shows he used sufficient force to constitute rape. If the evidence shows defendant guilty of the offense charged, he can not complain because he was not indicted for a higher grade of the same offense. There is no such merger of the offenses as discharges him for the offense for which he was indicted, if the evidence shows he was not only guilty of that but also of a higher grade of the same offense for which he

State v. Hamey.

was not indicted. (Overruling State v. Ellis, 74 Mo. 385; State v. Woolaver, 77 Mo. 103; State v. Strattman, 100 Mo. 540; and State v. Lingle, 128 Mo. 528. SHERWOOD and MARSHALL, JJ., dissenting.)

PER SHERWOOD, J., IN DISSENTING OPINION.

Rape: INSUFFICIENCY OF EVIDENCE. Prosecutrix lived with defendant's mother-in-law, in a house in the same yard, and only six rods distant from the house where defendant lived with his wife, family and prosecutrix's father. Prosecutrix testified that the defendant came to the house one evening, in the absence of his mother-in-law, but while she and defendant's family were present in the adjacent house, and had forcible carnal connection with prosecutrix. There was no disturbance audible at the other house, and prosecutrix made no complaint to her foster mother until *after the child was born*, when, in answer to a query of her foster mother, she stated that defendant was the cause of it. (See p. 224). At the time of the occurrence she testified that she was unable to cry out, because defendant held a pillow over her mouth; but after this was removed she made no outcry but went out and sat on the porch "to cool off." She continued friendly relations with defendant, with whom she was well acquainted, and three witnesses, contradicted only by prosecutrix, testified that they had had sexual intercourse with prosecutrix prior to defendant's alleged crime. Prosecutrix never made any complaint to her father at any time, and never spoke to defendant of the affair until *three months after the child was born*, and then only to ask him to *support the child*, when defendant promptly denied that he was the father of the child, and refused to support it; whereupon she had him arrested (see p. 225).

1. *Held*, insufficient to support a conviction of rape.

2. *Held*, further, that the crime charged in section 1838 is not one of the degrees of the crime charged in section 1837; and that under the provisions of section 22, article 2, of our Constitution, the accused must be apprised, by the indictment, of "the nature and cause of the accusation," and this being the case, he can not be indicted under section 1838 for the crime specified in that section, tried for that crime, proven guilty of the crime mentioned in section 1837, and then found guilty of another distinct and independent offense from that proven, to-wit, that mentioned in section 1838. To permit this to be done would be in direct violation of section 22 of the Bill of Rights, aforesaid.

3. *Held*, further, that under the provisions of section 28 of article 2, of our Constitution of 1875, declaring that "the right of

trial by jury as heretofore enjoyed shall remain inviolate," these words mean the right of trial by jury as enjoyed *at the time the Constitution of* 1875 *was adopted;* and that, consequently, section 1838, which attempts to change the method of trial by jury, theretofore existing, by requiring the judge to assess the punishment, is unconstitutional, as being repugnant to said section 28.

4. *Held,* further, that the crime of *rape,* as described in section 1837, being a crime of *force,* can not, under the authorities in this State (which are cited), be committed by the *same act* which accomplishes *incest, seduction, defiling a ward,* or the crime mentioned in section 1838.

Appeal from Buchanan Criminal Court.—*Hon. B. J. Casteel,* Judge.

AFFIRMED.

*Culver & Phillip* for appellant.

(1) The indictment is bad for the reason that section 1838, Revised Statutes 1899, upon which it is based, is unconstitutional in that it deprives the accused of the right of trial by jury, as guaranteed by section 28, article 2, Constitution of Missouri. The right of trial by jury at common law meant that one part of the jury's duty was to return into court a verdict, if they found defendant guilty, assessing his punishment as provided by law, or a general verdict of guilty, and thereupon the court fixed his punishment. Blackstone, Com., book 4, p. 361. But when Missouri entered the Union as a State she modified by statute the common-law duty of the jury by requiring it to return into a court a verdict, if they found the defendant guilty, assessing his punishment within the limits prescribed by the law; and only in the event that the jury could not agree on the punishment or made a mistake in the degree of punishment could the court fix the punishment. This continued to be the law and practice till the adoption of the Constitution of 1875. R. S. 1845, sec. 4, p. 883; R. S. 1855, sec. 4, p. 1196; G. S. 1865, sec. 5, p. 858; W. S., sec. 5, p. 1108. The Constitution of this State of 1865 provided

only that "the right of trial by jury shall remain inviolate." But when the Constitution of 1875 was adopted, for the first time it was provided that the "right of trial by jury as heretofore enjoyed shall remain inviolate." Const., sec. 28, art. 2. This means, if it means anything at all, the right of trial by jury as enjoyed in this State at the time of the adoption of the Constitution. State v. Bockstruck, 136 Mo. 358; Ice Co. v. Tamm, 138 Mo. 385; 1 Bishop Crim. Proc. (3 Ed.), 892; Flint, R. S. B. v. Foster, 48 Am. Dec. 260; Same v. Roberts, 48 Am. Dec. 178. But the duty of the jury in all felony cases, without exception, prior to the adoption of the present Constitution, was to assess the punishment. The court could not require a general verdict of guilty. Fooxe v. State, 7 Mo. 502. Therefore, section 1838, Revised Statutes 1899, is unconstitutional because it allows the jury to return into court a verdict of guilty only, and takes from it the duty of assessing the punishment, and reposes it in the court. R. S. 1899, sec. 1838. The right to trial by jury, as heretofore enjoyed, shall remain inviolate, is the constitutional provision. "The right is to remain. What right? Plainly the right as it existed before, the right to a trial by jury as it had become known to the previous jurisprudence of the State. The right is not described here; it is not said what shall be its incidents; it is mentioned as something well known and understood, under a particular name; and by implication at least, even a waiver of its advantages is forbidden. If the accused himself can not waive them, plainly the Legislature can not take them away. The next section of the Constitution repeats the guaranty of this method of trial 'in every criminal prosecution,' and nothing is better settled on the authorities than that the Legislature can not take away a single one of its substantial and beneficial incidents." Swart v. Kimball, 43 Mich. 448. (2) Nor can it be said that the constitutional provision does not apply to the offense charged in the case at bar because the statute creating it was passed after the adoption of the Constitution. The offense is a felony, and the constitutional provision applies to

all felonies.   Wynehamer v. People, 13 N. Y. 426; Colon v. Lisk, 60 Am. St. 611.   (3)   Nor can it be urged that though that portion of the statute which prescribes that the court shall fix the penalty is void, it is separable from the remainder of the section, which, therefore, should be held valid.   State v. Bockstruck, 136 Mo. 353; Landis v. Vineland, 54 N. J. L. 75. (4)   And the act is also void because it violates paragraph 17 of section 53 of article 4 of the State Constitution providing that "the General Assembly shall not pass any local or special law regulating the practice or jurisdiction of or changing the rules of evidence in any judicial proceeding or inquiry before the courts."   State v. Granneman, 132 Mo. 326.

*Edward C. Crow*, Attorney-General, for the State.

(1)   The indictment in this case is sufficient.   State v. Knock, 142 Mo. 522; State v. Burries, 126 Mo. 565.   (2)   The statute is constitutional.   The defendant's counsel make the objection to the constitutionality of section 1838, Revised Statutes 1899, that it deprives the accused of the right of trial by jury, because it authorizes the court to assess the punishment.   This proposition is grounded upon the theory that when the Constitution was adopted in 1820, providing in section 8 of article 13, "That the right of trial by jury shall remain inviolate," it meant only the right of trial by jury as provided by the territorial laws then in force, and not the right of trial by jury as it existed at common law.   State ex rel. v. Withrow, 133 Mo. 501; 130 U. S. 69; Cooley's Const. Lim. (6 Ed.), 504.   The assessment of punishment by jury is not an essential element of right of jury trial at common law. Cooley's Const. Lim. (6 Ed.), pp. 389, 390, 391, 392.   The essential elements of right that went to make up a jury trial at common law were neither added to nor detracted from by the constitutional guarantee that the right of trial by jury should remain inviolate.   41 Me. 533; 1 Bishop's Crim. Law (8 Ed.), sec. 934.   The common-law jury trial was intended to be pre-served by the Constitution, and it is beyond the power of the

General Assembly to impair the right or materially change its character. 133 Mo. 519; 55 N. H. 179; 48 N. H. 64; 74 N. Y. 406; 2 Ohio St. 229. One of the characteristics of the jury trial at common law was that usually the jury simply determined the fact of guilt or innocence and the court assessed the punishment. 1 Bishop's Criminal Law, sec. 934. Suppose that in certain classes of felonies the territorial statutes had provided that the courts should assess the penalty, would it be contended that after the adoption of the Constitution the General Assembly could not provide by statute that the jury should find the facts and assess the penalty? This very question has been passed upon, and it has always been held that such statutes are constitutional. 21 Mo. 269; 22 Mo. 320; 1 Bishop's Crim. Law. sec. 934; 7 Ind. 332; 70 Iowa 442. It is constitutional to divide the responsibility of the assessment of the punishment between the judge and jury. 22 Mo. 320; 1 Bishop's Crim. Law, sec. 934.

GANTT, J.—The defendant was indicted in the criminal court of Buchanan county for a violation of section 1838, Revised Statutes 1899, which was enacted April 8, 1895. [Laws 1895, p. 149.]

That act provides that "if any person over the age of sixteen years shall have carnal knowledge of any unmarried female, of previously chaste character, between the ages of fourteen and eighteen years of age, he shall be deemed guilty of a felony, and upon conviction shall be punished by imprisonment in the penitentiary for a term of two years, or by a fine of not less than one hundred dollars nor more than five hundred dollars, or by imprisonment in the county jail not less than one month or more than six months, or by both such fine and imprisonment, *in the discretion of the court.*"

The defendant was duly arraigned and entered his plea of not guilty.

At the November term, 1901, of said court, he was tried by a jury duly impaneled, which returned the following ver-

dict:   "We the jury find the defendant guilty and assess his punishment at imprisonment in the county jail for a term of one month and a fine of five hundred dollars."

And his motions for new trial and in arrest having been overruled, the court sentenced the defendant to imprisonment in the county jail for one month and to pay a fine of five hundred dollars.

From that sentence he appeals.

On a hearing of said appeal in Division Two the judgment of the criminal court was reversed, but one of the judges dissenting, the cause on motion of the Attorney-General was ordered transferred to the Court in Banc, and it has been again argued at length.

I.   When the cause was reversed in Division Two of this court it was accompanied with an order of discharge.   After the order was made transferring the cause to the Court in Banc, the defendant filed his motion to strike the same from the files, because, as he alleged, the Constitution did not confer upon the Attorney-General the right to have said cause transferred after a judgment by Division Two in favor of defendant's discharge.

The argument is that as the State is not entitled to an appeal or to a review of a judgment rendered in the trial court except in those instances expressly allowed by statute, it follows that it can have no right to have the judgment of an appellate court reviewed unless that right be expressly given.

This contention ignores the amendment to the Constitution of this State which was adopted at the general election in November, 1890.   Section one of that amendment confers exclusive cognizance of all criminal cases pending in the Supreme Court upon Division Two  thereof, provided, that a cause therein may be transferred to the Court in Banc as provided in section 4 of said amendment.   [Constitution, art. 6, amendment 1890.]   Section 4 provides that "when a judge of a

division dissents from the opinion therein," "the cause, on the application of the losing party, shall be transferred to the Court in Banc for its decision." Here, then, is the *express* authority in the organic law for removing the cause into the Court in Banc.

It is not, however, an appeal. The provision was designed to give a losing party in either division of the court a hearing, under the conditions specified, by the whole Court in Banc. It has been uniformly ruled that the State was entitled to the same benefit of this provision as any other party. [State v. Marcks, 140 Mo. 656.]

We are unanimously of opinion, that the order of transfer made by Division Two in this cause conferred jurisdiction of this appeal on the Court in Banc, and that the judgment of discharge by Division Two was thereby vacated, or at least suspended to abide the judgment of the Court in Banc, and accordingly the motion to strike the cause from the docket is overruled.

II.   Recurring now to the questions arising on this record.

The first proposition advanced by defendant is that section 1838, Revised Statutes 1899, is unconstitutional in that it violates sections 22, 28, and 30 of article 2, of the Constitution of Missouri of 1875. Those sections are in these words:

"Section 22.   In criminal prosecutions the accused shall have the right to appear and defend, in person and by counsel; to demand the nature and cause of the accusation; to meet the witnesses against him face to face; to have process to compel the attendance of witnesses in his behalf; and a speedy, public trial by an impartial jury of the county.

"Section 28.   The right of trial by jury, as heretofore enjoyed shall remain inviolate; but a jury for the trial of criminal or civil cases, in courts not of record, may consist of less than twelve men, as may be prescribed by law.   Here-

after, a grand jury shall consist of twelve men, any nine of whom concurring may find an indictment or a true bill.

"Section 30. That no person shall be deprived of life, liberty or property without due process of law."

The first premise assumed by the learned counsel is that "the right of trial by jury at *common law* meant than one part of the jury's duty was to return into court a verdict, if they found defendant guilty, assessing his punishment as provided by law, or a general verdict of guilty and thereupon the court fixed his punishment." [Citing Blackstone's Com., book 4, p. 361.]

The text of BLACKSTONE cited does not sustain counsel. On the contrary, that learned author says: "When the evidence on both sides is closed, and indeed when any evidence hath been given, the jury can not be discharged (unless in cases of evident necessity) till they have given in their verdict, but are to consider of it, and deliver it in, with the same forms as upon civil causes; only they can not, in a criminal case which touches life or member, give a privy verdict. But the judges may adjourn while the jury are withdrawn to confer, and return to receive the verdict in open court. And such public or open verdict may be either general, *guilty,* or *not guilty*; or special, setting forth all the circumstances of the case and praying the judgment of the court, whether, for instance, on the facts stated, it be murder, manslaughter, or no crime at all. This is where they doubt the matter of law, and therefore choose to leave it to the determination of the court; though they have the unquestionable right of determining upon all the circumstances and finding a general verdict, if they think proper so to hazard a breach of their oaths. And if their verdict be notoriously wrong, they may be punished and the verdict set aside by attaint at the suit of the king, but not at the suit of the prisoner. But the practice heretofore in use of fining, imprisoning or otherwise punishing jurors, merely at the discre-

Vol 168 mo—12.

tion of the court, for finding their verdicts contrary to the direction of the judge, was arbitrary, unconstitutional, and illegal, and is treated as such by Sir Thomas Smith two hundred years ago; who accounted 'such doings to be very violent, tyrannical, and contrary to the liberty and custom of the realm of England.' "

It will be observed there is nothing in this statement that justifies the assertion that at common law the jury had the right to assess the punishment of the prisoner if they convicted him; on the contrary, their verdict was guilty or not guilty, and the court fixed the punishment according to the laws in force, and such has been the common understanding of our law-writers and courts. [1 Bish. New Crim. Law, sec. 934; State v. Bangor, 41 Maine 533; United States v. Mundel, 6 Call 245; People ex rel. Bradley v. Ill. State Reformatory, 148 Ill. loc. cit. 422; People v. George, 167 Ill. 447; Miller v. State, 40 L. R. A. 109, 149 Ind. 607; State v. Skelton, 149 Ind. 641.]

But, say counsel, whatever the practice may have been or was at common law, when introduced into this State, it was soon modified by requiring the jury, if they found a defendant guilty, to assess his punishment within the limits prescribed by law and that such continued to be the statutory law until the adoption of the Constitution of 1875, when it was provided that "the right of trial by jury as heretofore enjoyed shall remain inviolate" and, hence, the statute (section 1838, Revised Statutes 1899) is unconstitutional because the jury under said section is not allowed to assess the punishment but that duty is imposed on the court.

This section (1838) must of course be read in conjunction with those general provisions of our statute law which govern in the trial of all prosecutions of felony. Since 1835, at least, the statutes of this State have provided that the courts in certain cases shall assess the punishment.

Thus sections 4, 5, 6 and 7 of article 7 of chapter 138,

Revised Statutes 1845, specify instances in which the court shall assess the punishment. Section 4 of that act provides that "where the jury find a verdict of guilty, and fail to agree on the punishment to be inflicted, or do not declare such punishment by their verdict, or assess a punishment not authorized by law, or in excess of that fixed by law, and in all cases of judgment by confession, the court shall assess and declare the punishment, and render a judgment accordingly." Section 5 provides that "if the jury assess a punishment, whether of imprisonment or fine, below the limit prescribed by law for the offense of which the defendant is convicted, the court shall pronounce sentence and render judgment according to the lowest limit prescribed by law." Section 6 provides that if the jury assess a punishment, whether of imprisonment or fine, greater than the limit prescribed by law for the offense, the court shall disregard the excess, and pronounce sentence and render judgment according to the limit prescribed by law in such cases. Section 7 also authorizes the court *"to reduce the extent or duration of the punishment* assessed by a jury" if, after it has found the conviction is proper, the punishment assessed is greater than under the circumstances of the case should be inflicted. [R. S. 1845, pp. 883, 884.]

The same sections are carried forward into the statutes of 1855. [2 R. S. 1855, pp. 1196 and 1197, sections 5, 6, 7 and 8.]

The same provisions are found in the General Statutes of 1865, p. 852, sections 5, 6, 7 and 8.

The same provisions are found in the revision of 1879. [R. S. 1879, p. 323, secs. 1930, 1931, 1932 and 1933.]

And also in 1889. [R. S. 1889, p. 981, secs. 4230, 4231, 4232 and 4233.]

And also in the Revised Statutes of 1899. [R. S. 1899, p. 692, secs. 2649, 2650, 2651 and 2652.]

The same provisions are found in the Revised Statutes of 1835. [R. S. 1835, p. 493, secs. 4, 5, 6 and 7.]

These references clearly show that the laws of Missouri have always recognized that it is constitutional to authorize either court or jury to assess the punishment, in a felony case.

It is to be observed that counsel do not assert that prior to the adoption of the Constitution of 1875 it was a constitutional right, of defendant, to have the jury assess his punishment in that class of felonies in which the punishment ranged from a minimum to a maximum punishment and vesting a discretion in the jury to fix it within those limits.    Certainly there was, both under the Constitution of 1820 and that of 1865, a constitutional right of trial by jury, but that phrase was too well understood to admit of such a construction as counsel now place upon the present provision in section 28 of article 2 of the Constitution of 1875.

Says Mr. Justice STORY in his work on the Constitution (vol. 2, sec. 1779): "It seems hardly necessary in this place to expatiate upon the antiquity or importance of the trial by jury in criminal cases.    It was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties, and watched with an unceasing jealousy and solicitude.    .    .    .    The right constitutes one of the fundamental articles of Magna Charta, in which it is declared, 'No man shall be arrested, nor imprisoned, nor banished, nor deprived of life, etc., but by the judgment of his peers or by the law of the land.'    The judgment of his peers here alluded to, and commonly called, in the quaint language of former times, a trial *per pais*, or trial by the country, is the trial by a jury, who are called the peers of the party accused, being of the like condition and equality in the State.    When our more immediate ancestors removed to America, they brought this great privilege with them, as their birthright and inheritance, as a part of that admirable common law which had fenced round and interposed barriers on every side against the approaches of arbitrary power.    It is now incorporated into all our State Constitutions

as a fundamental right, and the Constitution of the United States would have been justly obnoxious to the most conclusive objection if it had not recognized and confirmed it in the most solemn terms."

It will be remembered that this eulogy of Judge STORY of trial by jury referred to the trial by jury at common law, which did not include the right of the jury to assess the punishment. It will be further observed that neither Mr. Justice Story nor the framers of the Constitution of the United States, or of our own Constitution, thought it necessary to define what the words "trial by jury" meant. He and they assumed that these words *ex vi termini* meant a trial by *twelve* men, *impartially selected* from the county in which the alleged crime was committed, who must unanimously concur in the guilt of the accused before he could be legally convicted. A law dispensing with any of these essential requisites, we all concede, would be a denial of the right of trial by jury and necessarily unconstitutional. [Ex parte Slater, 72 Mo. 102.]

Says Judge COOLEY in his Constitutional Limitations (6 Ed.), 389, 390: "Whenever the right of trial by jury is guaranteed by the Constitution without qualification or restriction, it must be understood as retained *in all those cases* which were triable by jury at common law, and with all the *common-law* incidents to a jury trial, so far, at least, as can be regarded as tending to the protection of the accused."

In State ex rel. v. Withrow, 133 Mo. 500, this court, through SHERWOOD, J., said: "And section 28 of our Bill of Rights declares that 'the right of trial by jury as heretofore enjoyed shall remain inviolate,' which means that all the substantial incidents and consequences which pertained to the right of trial by jury are beyond the reach of hostile legislation, and are preserved *in their ancient substantial extent as existing at common law.*" This language is significant because BARCLAY, J., contended that we had adopted the Missouri trial by jury in 1820 and not the English.

Now it is conceded our laws secure to the defendant in a prosecution under this section (1838) a trial by jury with every common-law incident and protection. These briefly were:

First. The jury must be twelve men indifferent between the prisoner and the commonwealth; to secure this challenges must be allowed.

Second. The jury must be summoned from the vicinage where the crime is supposed to have been committed. This gives the accused on the trial the benefit of his own good character and standing with his neighbors.

Third. The jury must unanimously concur in the verdict.

Fourth. The jurors must be left free to act in accordance with the dictates of their own judgment.

As the right and duty devolved upon the court at common law to assess the punishment, it is plain this statute does not violate the common-law jury trial in leaving the punishment to the court. All of these have been accorded to the defendant in this case.

. The Constitution of 1820 provided " that the right of trial by jury shall remain inviolate," and the Constitution of 1865 retained the same formula. According to Judge COOLEY these words in both of these Constitutions must mean that the right was retained in *all those cases* which were triable by a jury at common law and with all the substantial common-law incidents of a jury trial, among which it can not be maintained was the right to have the jury in a felony case assess the punishment when it was in the alternative or subject to a scale.

We are thus brought to consider the true signification of the words "the right of trial by jury as heretofore enjoyed shall remain inviolate," in the Constitution of 1875.

The defendant insists that because for many years prior to 1875 the *duty* of assessing the punishment had been imposed by our statutes upon the jury when they convicted a defendant, except in those cases in which the law fixed but one

punishment, that was one of the rights secured by the Constitution, and such was the view taken in Division Two in this case, and, hence, can never be changed by statute until the Constitution is changed.

It will certainly not be contended that prior to the Constitution of 1875 the Legislature could not have repealed the general provision which has been in all our revisions from 1845 to the present time which requires that "in all cases of a verdict of conviction for any offense where by law there is any alternative or discretion in regard to the kind or extent of punishment to be inflicted, the jury may assess and declare the punishment in their verdict.".

There was nothing in the Constitution of 1820 or 1865 which tied the hands of one Legislature so that it could not repeal or modify the acts of its predecessors. It is fundamental in a system of government like ours that one Legislature can not pass an irrepealable law. Says Judge Cooley, "The Constitution, in conferring the legislative authority, has prescribed to its exercise any limitations which the people saw fit to impose; and no other power than the people can superadd other limitations. To say that the Legislature may pass irrepealable laws, is to say that it may alter the very Constitution from which it derives its authority; since, in so far as one Legislature could bind a subsequent one by its enactments, it could in the same degree reduce the legislative power of its successors; and the process might be repeated, until, one by one, the subjects of legislation would be excluded altogether from their control, and the constitutional provision that the legislative power shall be vested in two houses would be, to a greater or less degree rendered ineffectual." [Cooley, Constitutional Lim., p. 147.]

"Acts of Parliament," says Blackstone, "derogatory from the power of subsequent Parliaments, bind not." [Bloomer v. Stolly, 5 McLean 158; Kellogg v. Oshkosh, 14 Wis. 623.]

And again, COOLEY in his Constitutional Limitations, at page 343, says, "We have said in another place that citizens have no vested rights in the existing general laws of the State which can preclude their amendment or repeal, and there is no implied promise on the part of the State to protect the citizens against incidental injury occasioned by changes in the law."

As the act of the Legislature prior to 1875 permitting a jury to assess the punishment in cases when there was a discretion as to kind or length of punishment was a legislative and not a constitutional enactment, any subsequent Legislature could repeal or amend the same unless the contention of defendant is correct that by the addition of the phrase "as heretofore enjoyed" the people have imposed a constitutional prohibition upon any change in our criminal practice so long as the present Constitution shall survive.

What force and effect is to be attributed to this change in the Constitution in 1875? Fortunately the question is not altogether a new one.

In 1870 the people of Illinois adopted a new Constitution in which they provided that the right of trial by jury *as heretofore enjoyed* shall remain inviolate. In 1897 the Supreme Court of that State was called upon to construe the effect of adding the words "as heretofore enjoyed" to the Constitutions of 1818 and 1848 which provided that the right of trial by jury shall remain inviolate as did our Constitution of 1820 and 1865. The construction was invoked in George v. People, 167 Ill. 447, in which the constitutionality of the act of the General Assembly of that State passed June 26, 1895, entitled "An Act in relation to the sentence of persons convicted of crime, and providing a system of parole." Section one of said act required the *court to impose the sentence,* whereas previous to and at the time of the adoption of the Constitution of 1870, there was a general provision in the criminal code of that State which provided that in all cases where the punishment shall be confinement in the penitentiary if the case is tried by a

jury the jury shall say in their verdict for what time the offender shall be confined.    [R. S. 1845, p. 182, sec. 168; 1 Starr & Curtis Annotated Ill. Stats., p. 1409, sec. 629.]    The prisoner in that case (as has defendant in this) had been tried by a jury of twelve chosen from the county in which the offense was committed and they had unanimously pronounced him guilty, but under the Act of 1895 had not fixed or assessed his punishment.    The court sentenced him according to the act and on appeal the identical question here raised was presented to the Supreme Court.    There, as here, it was earnestly contended that "the right of trial by jury as heretofore enjoyed shall remain inviolate," secured to defendant *the right to have the jury assess his punishment,* but that court held that the right of trial by jury *was the same* under the Constitution of 1870 as it was under those of 1818 and 1848.    Touching the argument now made the court said:    "It is, however, said, that the words 'as heretofore enjoyed' relate to those enjoyed at the time of the adoption of the Constitution of 1870.    The definition given by Webster of the word 'heretofore' is: 'in times before the present; formerly.'    The word 'heretofore,' as used, evidently relates to the past, and in order to determine the true meaning of the words 'the right of trial by jury as heretofore enjoyed,' it is necessary to go back to the common law of England.    When this is done it will be found that the right of trial by jury constitutes certain specified things, which can not be dispensed with or disregarded on the trial of a person charged with a felony.    A jury of twelve men must be impaneled, and any less number would not be a common-law jury. The jury must be indifferent between the prisoner and the people.    They must be summoned from the vicinage or body of the county in which the crime was alleged to have been committed. The jury must unanimously concur in the verdict (this latter is one of the old requirements of the common law).    The final decision upon the facts is to rest with the jury, and the court can not interfere to coerce them to agree upon a verdict against

their convictions [Cooley's Const. Lim., 394]. These are
some of the rights guaranteed by the Constitution. But under
the common law a prisoner on trial for a felony has no consti-
tutional right to have his term of punishment fixed by a jury.
At common law the jury returned a verdict of guilty or not
guilty, and the punishment was fixed by the court and governed
by the laws in force [2 Blackstone, book 4, 361]. It is there-
fore plain that the rights of the defendant, which are guaran-
teed by the Constitution, were not infringed upon or taken
from him. In Kelley v. People, 115 Ill. 583, a conviction for
a second offense was sustained, where the law itself fixed the
time the prisoner should be punished by confinement in the
penitentiary. If the language, 'the right of trial by jury as
heretofore enjoyed shall remain inviolate,' shall be construed
to mean that the system of trial by jury as it existed by statute
at the time the Constitution of 1870 was adopted was engrafted
on and became a part of the Constitution, as is contended,
many embarrassing results never contemplated would follow.
When the Constitution of 1870 was adopted the statute pro-
vided that juries in all cases shall be judges of the law and fact.
Did that provision of the statute become a part of the Consti-
tution, so that it is beyond the power of the Legislature to
change it? At the time the Constitution of 1870 was adopted
the statute required the court, in the trial of both criminal and
civil cases, to instruct the jury in writing, oral instructions
being prohibited. If the Legislature should now pass an act
providing that all instructions should be oral, would such an
act be unconstitutional? Suppose the Legislature should pass
an act adopting a new system of impaneling a jury entirely
different from the one in force when the Constitution of 1870
was adopted, would such an act be unconstitutional? Indeed,
since the adoption of the Constitution of 1870 numerous
changes have been made in the criminal law relating to jury
trials. Are these changes all void under the language of the
Constitution 'as heretofore enjoyed?' Other examples might

be given, but they are not required.  It is manifest that the language of the Constitution was never intended to confer upon the jury a constitutional right to fix the term of imprison-ment on the trial of a person indicted for a felony."

Prior to that case the constitutionality of the reformatory act of 1891 was challenged in People v. State Reformatory, 148 Ill. 413.  Chief Justice BAKER wrote the opinion of the court and on this point, said: "Nor is it true that a prisoner on trial for burglary and larceny, or for any other violation of the criminal law, has a constitutional right to' have the quantity of his punishment fixed by a jury.  At common law the jury either returned a special verdict, setting forth all the circum-stances of the case and praying the judgment of the court thereon, or a general verdict of guilty or not guilty.   The pun-ishment was fixed by the court, and governed by the laws in force.   [2 Blackstone's Com., book 4, p. 361.]   And in this State at the present time, the penalties for violations of the criminal code are in many cases not fixed by the jury, but by the court.   [Rev. Stats., p. 413, secs. 446, 447, etc.]   The constitutional right of trial by jury is limited to the trial of the question of guilt or innocence, and we think there can be no question of the validity of the section of the statute to which we have made reference in this connection."

That opinion was written in 1894, twenty-four years after the adoption of the Constitution of Illinois of 1870.

In Miller v. The State, 149 Ind. 607 (40 L. R. A. 109), the reformatory act of Indiana was challenged as unconstitu-tional.  Said the court: "But because the jury are not al-lowed to fix the amount of the punishment which is to be in-flicted, it is contended that the reformatory act deprives the accused of a jury trial, in violation of section 13 of the Bill of Rights.   This very objection to a similar act, under a similar constitutional provision in the Constitution of Illinois, in Peo-ple ex rel. Bradley v. Illinois State Reformatory, 148 Ill. 422, was held not good.   It was there said: 'Nor is it true that a

prisoner on trial for burglary and larceny has a constitutional right to have the quantity of punishment fixed by a jury [and repeating the extract already copied from the 148 Ill. supra]. The Supreme Court of Illinois again decided the same way in George v. People, 167 Ill. 447. We therefore conclude that the act does not deprive the defendant of a jury trial, in violation of the Constitution."

It is significant that section 19 of the Bill of Rights of the Constitution of Indiana provided that, "in all criminal cases whatever, the jury shall have the right to determine the law and the facts," and when the same point was urged in State v. Skelton, 149 Ind. 641, the court again ruled in the same way and added additional reasons against it as follows: "We are unable to see that any of these beneficent provisions of the bill of rights is violated by not requiring the jury to fix the punishment. Our statute, it is true, as we have seen, has heretofore provided that the jury shall in their verdict name the punishment to be inflicted. But the Constitution makes no such requirement; and that which the statute has done the statute may undo, provided it remain within the bounds fixed by the Constitution. The last act of the Legislature controls in case of conflict. Indeed, aside from any statutory requirement, the fixing of punishment can not be considered as any necessary part of the trial of a cause. When the verdict or finding has determined the existence of the crime charged, the trial is ended, and the punishment to be thereafter inflicted is the sentence which the court pronounces under the law then in force. The fixing of such punishment seems to be a proper function of a court, rather than of a jury, a matter of judgment, rather than of finding or verdict. Certainly, the leaving of this duty to the court instead of to the jury, as the act in question does, is no invasion of the sacred right of trial by jury. Article 6 of the amendments to the Constitution of the United States secures the same right to jury trial in all criminal prosecutions; but it has never been held that the practice in the Fed-

eral courts, according to which the court and not the jury fixes the punishment, is an infringement of the right of trial by jury guaranteed by the Constitution.   Neither is the provision in question a violation of the Constitution, which provides that:   'In all criminal cases whatever, the jury shall have the right to determine the law and the facts.'   [Const., art. 1, sec. 19.]   The law, when applied to the facts found, determines the guilt or innocence of the accused, and, in case of guilt, determines the crime committed.   Of all this the jury has supreme control, under the Constitution.   But the sentence is the judgment of the court as to what, within the statutory limits, ought to be the proper punishment for the crime of which the defendant has been convicted.   We do not think, therefore, that the verdict provided for in the new statute is any violation of the Constitution.   The right of trial by jury, the right to have the innocence or guilt of the person charged with the crime determined solely by a jury of his peers, is as fully guarded under the present as under the former statute."

The exact formula, "the right of trial by jury as heretofore enjoyed" used in the Constitution of Illinois of 1870 and in the Constitution of Missouri of 1875, we have not found in any other State Constitution.   That of Pennsylvania, adopted in 1874, more nearly approaches it.   There the language is, "trial by jury *shall be as heretofore,* and the right thereof shall *remain inviolate.*"   [Art. 1, sec. 6.]   That of New York, is "The trial by jury, *in all cases* in which it has been heretofore used, shall remain inviolate."   [Art. 1, sec. 2.]

There is, however, practically no difference in their meaning.   In Byers v. Com., 42 Pa. St. 89, STRONG, J., said:   "It is insisted that this act is repugnant to that clause of the Constitution which guarantees 'that trial by jury shall be as heretofore, and the right thereof remain inviolate.'   The objection is based upon a misconception of what that right of trial by jury was which is protected by the Constitution.   The founders of this State brought with them to their new abode

the usages to which they had been accustomed in the land from which they emigrated. Among them was trial by jury. Its extent and its privileges were perfectly understood, and in bringing it with them the founders of the commonwealth doubtless intended to bring it as they had enjoyed it. *None* of the framers of government or Constitutions under which we have lived have contemplated any extension of the right beyond the limits within which it had been enjoyed previous to the settlement of the State or the adoption of the Constitution. No intention to enlarge it appears in the laws agreed upon in England in 1682. Our first Constitution, that of 1776, declared that 'trials by jury shall be as heretofore.' The Constitution of 1790, and the amended one of 1838, adopted substantially the same provision. All looked to *preservation*, not extension. It is *the old right*, whatever it was, the one previously enjoyed, that must remain inviolable alike in its mode of enjoyment and in its extent."

After discussing various cases such as suits in equity and various acts to punish petty offenses, in which the right of trial by jury never existed in England, the judge proceeds; "These acts were in force in 1776. In view of them, the first Constitution was made, and it declared, not that trial by jury shall be in all cases, *but as theretofore. And when that gave place to the later Constitutions they undertook to preserve* only that right which had been enjoyed."

In that case the attention of the court was directed to the character of cases in which the right could be demanded, not the incidents of the right itself.

In Swart v. Kimball, 43 Mich. 448, it was the essential incident of a right of trial by jury *of the vicinage or county* which the statute denied and of course it was unconstitutional.

In Wynehamer v. The People, 13 N. Y. 426, it was ruled, that felonies were triable by a jury and new felonies denounced and defined after the adoption of the Constitution must be so

State v. Hamey.

tried "because they belong *to the class of cases*, in which, at the adoption of the Constitution, such a trial was used."

But no case which our examination has enabled us to find has announced the doctrine that the fixing or assessment of the punishment in a criminal case by the jury was an essential element of a jury trial, but the common law was clearly otherwise as the authorities already cited, we think, conclusively establish. In every case to which we have had access, when the prisoner has been adjudged to have been denied an essential incident of jury trial, it appeared either that there was a denial of his right to trial by jury of the county or vicinage, or that he was denied a jury of twelve, or the jurors were not impartial or was denied by statute a jury in cases which were so triable at common law.

We reject the argument that the common-law method never obtained in this State as to jury trials. The common-law was adopted in 1816 in Missouri. [1 Terr. Laws, p. 436, ch. 154.]

In Vaughn v. Scade, 30 Mo. 604, Judge SCOTT says: "The term 'trial by jury' was well known and understood at the common-law, *and in that sense it was adopted in our Bill of Rights.* Of course the non-essentials of that institution, such as concern the qualifications of jurors, the mode of summoning them, and many other such matters, were left to the regulation of law. The Constitution is preserved in retaining the substance of that form of trial, *as it was known and practiced among those from whom we have derived it.* This subject has undergone examination in other tribunals, and we find them concurring in these views. They unite in declaring that where there is a constitutional guaranty of the right to a trial by jury, twelve is the number of which the jury must be composed."

When, therefore, the text-writers and courts speak of the *beneficial incidents of jury trial* they must be understood as referring to those essentials which have already been men-

tioned, to-wit, *twelve* impartial jurors, indifferent between the State and the prisoner; they must be summoned from the vicinage or county in which the crime is charged to have been committed; they must unanimously agree on their verdict and must be left free to act in accordance with their oaths and judgment. These were the essentials which the Constitution was designed to preserve, *not to extend*—and it was the right to a trial by a jury thus organized and with these incidents which the framers of the Constitution and the people intended should remain inviolate.

When we consider that the guaranty of a jury trial in the Constitution of the United States has never been construed as permitting a jury to assess the punishment, but that the invariable practice has been to require the judge to fix the punishment within the limits of the law. and a large number of our sister States whose Constitutions contain this same guaranty also devolve that duty upon the judges, it is absolutely certain that it was no essential part of a jury trial at common law that the jury should also fix the punishment if they convicted the prisoner. The testimony is too overwhelming to the contrary.

If it was *not an essential*, then as Judge SCOTT says in Vaughan v. Scade, it was left to the Legislature to determine whether it would require the jury or the judge to assess the punishment where alternative or discretionary punishments are prescribed by law. The jealousy of the English people and our forefathers and our own against committing the trial of disputed facts and the determination of the guilt or innocence of an accused, to the court did not extend to the assessment of the punishment which is prescribed within fixed limits, and would govern either judge or jury in assessing it.

The well-merited eulogies upon jury trial are not based upon this right of a jury to fix the amount of punishment, but upon that far greater prerogative of weighing the evidence and passing upon the guilt or innocence of the defendant.

Lord CAMDEN, ERSKINE, MAYNARD and BLACKSTONE

who so eloquently commended "trial by jury" as the great birthright of the Englishman, as "his fence and protection against all frauds and surprises and against all storms of power," knew nothing of the system in this State and some of our sister States requiring the jury to assess the punishment. Their commendation was of the enlightened common-law system of jury trial which had been perfected after years of experience and after English juries had finally triumphed over despotic power and servile judges.   It never could have, in our opinion, been intended to tie up the hands of the people themselves through their chosen representatives so that no beneficial changes and regulations of the trial by jury could be made as subsequent experience might dictate, as long as the essentials are preserved.   As was said in Beers v. Beers, 4 Conn. 535, it is within the reasonable intendment of the Constitution, so long as the recognized essentials of a common-law jury trial are preserved, to adopt new methods if the public interest demand such changes, and there is nothing in the Constitution of 1875 which requires the General Assembly to forever perpetuate the statutes requiring juries to fix the punishment where alternative punishments are prescribed.

As said by the Attorney-General, the Constitution is not a grant of powers to the General Assembly, but merely contains certain limitations and restrictions upon it, and if there is no provision in it that prohibits the General Assembly from imposing upon the courts the duty of assessing the punishment prescribed within the limits of the law, then it has the constitutional power to so direct and the guaranty of the right of "trial by jury as heretofore enjoyed" in and of itself does not prohibit it as those words simply preserve the right of trial by jury which our former Constitutions had also secured to us.

But I am referred to the decision in Ice Co. v. Tamm, 138 Mo. 385, in which Division Two of this court held a compulsory reference to a referee for the examination of a long ac-

Vol 168 mo—13.

count was not an infringement on the constitutional guaranty of trial by jury as heretofore enjoyed.   An examination of that case will show that the decision proceeded on the view that inasmuch as the Supreme Court of this State as early as the 15 Mo. 144, in Shepard v. Bank, had ruled that such a reference did not violate the right of trial by jury guaranteed by the Constitution of 1820, and then the people of this State with full knowledge of that decision continued the same language in the Constitution of 1865, and the General Statutes of 1865, and this court in 1874, prior to the adoption of our present Constitution, in Edwardson v. Garnhart, 56 Mo. 85, had held it was not to be presumed in these circumstances that by the adoption of the Constitution of 1865 the people intended to change the construction placed by this court, on the same statute under the Constitution of 1820, a fortiori, the Constitution of 1875 was not intended to do away with compulsory references in proper cases under that statute, and we said:   "This, then, was the state of the law when the Constitution was framed and submitted to the people of Missouri for adoption.   As then understood and construed by the court of last resort in this State, neither the Constitution of 1820 nor that of 1865 prohibited the courts from referring cases without the consent of either party in the cases mentioned in the statutes.   The right to a jury trial then was modified to this extent by this power to appoint referees.   These references had been sanctioned by the statutes, and the opinions of the Supreme Court many years before that Constitution was framed, and when the people adopted it they ratified the provision as to jury trial as it had been enjoyed previously thereto; that is to say, they adopted it with the construction already placed upon it; otherwise, the words 'as heretofore enjoyed' are utterly meaningless."   We submit that opinion rests upon sound legal ground.

It has been uniformly and consistently ruled that where judicial construction has put a certain meaning on the words of a statute and then the Legislature in a subsequent act *in pari*

*materia* uses the same words, the presumption arises that the Legislature intended to express the meaning previously put upon them.    [McNichol v. Agency, 74 Mo. 457; Sanders v. Anchor Line, 97 Mo. 26.]

And especially is this so when revisions of the laws and constitutions have intervened and the language construed has been retained.    [Sanders v. Anchor Line, 97 Mo. 26.]

Outside of the reference to the state of the law at the time of the adoption of the Constitution and to show that it had been the same with regard to references since the admission of the State into the Union, the decision throws no light upon the question for decision.

We hold that the construction put upon the words "as heretofore enjoyed" by the Supreme Court of Illinois and approved by the Supreme Courts of Indiana and Pennsylvania, is the correct interpretation and that the act in question (section 1838, Revised Statutes 1899) is not unconstitutional because it permits the court instead of the jury to assess the punishment.

A verdict of "guilty" without assessing the punishment under our laws which permit the jury to fix the punishment is not a failure to find a part of the *issue*.    [State v. Foster, 115 Mo. 451; State v. Robb, 90 Mo. 30.]

In State v. Foster, 115 Mo. 450, it was said: "Among the causes thus alleged in that motion is one claiming that *to the jury alone* belonged the fixing of the penalty for the crime of which defendant was found guilty.    This contention is without foundation.    The jury having failed to assess the punishment it belonged to the court to assess it, and render judgment accordingly (R. S. 1889, sec. 4230)."    State v. Wynn, 1 Blackford, 28, confirms this view.    In that case the jury returned a verdict "fining defendants $10 each" and it was reversed because the jury did not find them "guilty," which, said the court, "is a total neglect of the *whole* subject-matter *put in issue*."    So that if they had found them guilty they would

have responded to the *whole issue.* Without that finding no judgment could be imposed. So in State v. Foster, supra, had the jury *failed* to find defendant "guilty," the court would have been powerless to punish him, but having done so their verdict was ample to sustain the judgment which we affirmed. The office of the jury at common law is to find the truth of *disputed facts,* not to find *the law.* That is written for the guidance of court and jury alike.

When the jury in a case of felony bring in a verdict of guilty, there is no room or occasion for any waiver by the defendant. The law of this State which has never been questioned provides that in such case the court shall assess the punishment and render the judgment. [State v. Foster, supra.] His attempted waiver, in the circumstances suggested, would not in the least affect the power of the court to assess his punishment.

It only remains to be added that this statute has been twice construed by this court, once in State v. Knock, 142 Mo. 515, in which it was sustained without a suggestion of unconstitutionality and the defendant sentenced to the penitentiary, and State v. Hall, 164 Mo. 528, in which the Knock case was approved.

"It needs only to be said that in the determination of a question of the constitutionality of a law it is a settled rule for the guidance of the courts that the acts of the Legislature are presumed to be constitutional, and *it is only when they manifestly infringe on some provision of the Constitution,* that they can be declared void for that reason. In case of doubt every possible presumption not directly inconsistent with the language and subject-matter is to be made in favor of the constitutionality of the Act." [Phillips v. Railroad, 86 Mo. 543; State v. Layton, 160 Mo. 474; Cooley Const. Lim. (6 Ed.), p. 216.] With the highest courts of our sister States maintaining the constitutionality of laws like this, it certainly can not

be said to be removed from doubt, even if we do not accord them the meed of unanswerable argument.

III.   The act is a general and not a special law.   It operates equally upon all who violate its provisions and establishes one mode of punishment for all such.   It operates in every county of the State. [State ex inf. v. Ins. Co., 150 Mo. 136.]

IV.   The fact that the jury assessed the punishment does not vitiate the verdict.   The court could ignore it and assess the punishment itself, and must be held to have done so, by adopting it, and rendering judgment.   This identical case came before the Court of Appeals in Harvey v. Commonwealth, 23 Gratt. 941, and it was ruled that although it was the duty of the court to assess the punishment and it had directed the jury to do so, and the jury had fixed the punishment, it was held it did not vitiate the verdict or the judgment of the circuit court.

V.   I find no error in the admission of Mrs. Irwin's testimony as to the declarations of the prosecutrix to her.   This was drawn out by the defendant himself, and he can not complain of error committed at his own instigation and of his own seeking.

VI. In the divisional opinion much time is devoted to discussing whether defendant was, or was not guilty of "rape," and the conclusion was reached that he was not.   As he was not indicted for rape, the conclusion absolves the jury and criminal court of having convicted him of a crime of which he was not guilty, and for which he was not indicted.   The indictment is bottomed upon section 1838 which prescribes that if a person over sixteen years of age have carnal intercourse with an unmarried female of previously chaste character, between the ages of fourteen and eighteen years of age, he shall be deemed guilty of a felony and punished as therein prescribed. It is apparent that within the ages mentioned the female is incapable under the law of consenting to the defilement of her person.   But it is argued by the able counsel for defendant that the court erred in refusing to instruct the jury that if

they believed defendant had sexual intercourse with the prosecutrix against her will and consent, and that such intercourse was had by means of force and violence, and prosecutrix resisted having such intercourse, they should aquit defendant, and in instructing that sexual intercourse by a man over sixteen years of age with an unmarried female of previous chaste character who is between the ages of fourteen and eighteen years, would render him guilty under this law whether said act was accomplished by force or with or without her consent.

The learned criminal court unquestionably followed the decision of this court in State v. Knock, 142 Mo. 515, in which case this statute first received a construction by this court. In that case, as will be seen by a reference to the statement of the facts on page 520 of the said report, a young lady had gone to sleep in her own room, in the residence of the defendant, who was her uncle by marriage, and during the night was aroused by the presence of the defendant who was attempting to get on top of her. "He grabbed her hands and held them over her mouth to prevent her screaming. With his knees he forced her limbs apart and had sexual intercourse with her." On another occasion, he entered her room while she was dressing and told her if she screamed he would kill her and again forcibly had connection with her. In that case the criminal court instructed the jury that sexual intercourse with an unmarried female of previously chaste character, who is between the ages of fourteen and eighteen years of age, is a violation of the law *with or without her consent.*

The defendant in that case requested the court to give the following instruction: "The court instructs the jury that if you believe from the evidence that the defendant had carnal knowledge of the prosecutrix against her will and only accomplished the act by the use of force, then the defendant is not guilty of the offense charged, and you must acquit him." This the trial court refused. Speaking of this action of the court, this court said: "The instructions asked by defendant were

properly refused for several reasons.   In the first place, it is not the law, as asserted in defendant's first instruction, that if 'force' be used, this exonerates the force-user when charged with the crime mentioned in the act of 1895, supra."

Obviously the criminal court did not err in this case, unless that opinion was erroneous.   We can not agree that there was no evidence of force in that case.   Indeed there is a striking similarity in the character of force used in the two cases.

Was the decision in the Knock case improperly decided?

Clearly the statute itself makes no distinction between sexual intercourse with and without consent or with and without force.   In respect to the matter of consent it is not a new character of legislation in this State.   Thus section 3480, Revised Statutes 1889 (now sec. 1837, R. S. 1899) provided that "every person who shall be convicted of rape, *either* by carnally and unlawfully knowing any female child under the age of fourteen years," etc., and it has been uniformly ruled that "carnal knowledge of a female child under fourteen years of age is rape under this statute whether accomplished with or without force, or with or without the consent of the child." [State v. Wray, 109 Mo. 599; State v. Meinhart, 73 Mo. 562; State v. Houx, 109 Mo. 654; State v. Baskett, 111 Mo. 272; State v. Duffey, 128 Mo. 557; State v. Baker, 136 Mo. 74; State v. Burries, 126 Mo. 565.]

If, as we have so often held, it is competent for the legislature to provide that carnal knowledge of a female child under fourteen shall be rape irrespective of consent or force, why could it not provide that if a man of over sixteen years of age shall have carnal knowledge of an unmarried female of previously chaste character between fourteen and eighteen years of age he is guilty of a felony "irrespective of force or consent on her part?"

But the argument is that the carnal knowledge under section 1838 is merged into the higher crime of rape when the evidence discloses force.

Bishop in his Crim. Law (7 Ed.), vol. 1, sec. 786, says: "The doctrine of merger is applicable to two classes of cases— the one, where a criminal act falls within the definitions of two or more separate offenses; the other, where offenses are so graded that the less culpable are included in those involving a larger guilt as shown at section 780 in our last chapter. The general rule is, as there explained, that the prosecuting power may select for conviction any one of these offenses, *and the defendant can not object though his guilt covers also a larger or different one.* Merger, in the criminal law, occurs where the same act of crime is within the definition of a misdemeanor and likewise a felony, or of a felony and likewise of a treason; and the rule is, that the lower grade merges in the higher." That is, an act can not be both a felony and a misdemeanor, "a doctrine which applies only where the identical act constitutes both offenses."

Again, in section 791, same volume, he says, "Subject to whatever exception may be found in the doctrine of merger, a criminal person may be holden for any crime, of whatever nature, which can be legally *carved out* of his act. He is not to elect, but the prosecuting power is. *If the evidence shows him to be guilty of a higher offense than he stands indicted for,* or of a lower, or of one differing in nature, whether under a statute or at the common-law, he can not be heard to complain, *the question* being *whether it shows him to be guilty of the one charged.*"

In Commonwealth v. McPike, 3 Cush. 181, the defendant was held to have no just ground of objection to a conviction under an indictment for manslaughter because the facts proved he had been guilty of murder. Our statute expressly permits this in all cases in which there are degrees of crime and the finding is of a less degree than that charged in the indictment and a verdict for manslaughter or murder in the second degree will not be disturbed because the evidence shows defendant guilty of murder in the first degree. But here we

are confronted with State v. Woolaver, 77 Mo. 103; State v. Strattman, 100 Mo. 540, and State v. Lingle, 128 Mo. 528, all of which follow State v. Ellis, 74 Mo. 385, in which it was ruled on an indictment for incest that if it appeared that the sexual intercourse had been effected by force it was rape and the conviction for incest could not stand.

None of these cases, except State v. Ellis, discuss the principle on which this ruling was based, but simply follow it. In that case it is put upon the ground of merger; that rape was the higher crime and incest the lesser and the latter was merged in the rape.    The correctness of that decision is now challenged.

In all of those cases except the Ellis case it was ruled that before the jury could acquit on the ground that the crime of rape had been shown the jury must believe that if the defendant were on trial for rape it would be their duty to convict him of that charge, and in each this court held the conviction of the less offense proper notwithstanding in each the female prosecutrix had testified she was "forced," this court saying that the evidence fell short of making out a case of rape.

In State v. Ellis, this court cited the following authorities:   People v. Harriden, 1 Parker, C. C. 344, a *nisi prius* case, a prosecution for incest, by a father with his daughter, and the trial judge ruled that the statute against incest applied only to cases where the connection was by *mutual consent*, and if the connection was accomplished by force, to such an extent as to render defendant guilty of rape, incest was not sustained, and to the same effect is Noble v. State, 22 Ohio St. 541, in which it was also held that emission was an essential in incest, a doctrine nowhere else recognized in this country.   In Croghan v. State, 22 Wis. 444, in a prosecution for seduction it was held error to instruct the jury that "if the woman ultimately consented to the illicit intercourse, the crime was seduction and not rape, although she consented partly through fear," etc. The court held the woman must be tempted, lured and led

astray through influence and persuasion employed by her seducer until she freely consented, in order to constitute seduction. That the instruction was erroneous as to the proof in seduction we have no doubt.

DeGroat v. People, 39 Minn. 124, was decided upon the ground that in incest both parties must consent, under the statute of that State, and as there was evidence of force it could not be incest. In State v. Thomas, 53 Iowa 214, it was held rape and incest could not be charged as a compound offense under the statute of that State, BECK and DAY, JJ., dissenting.

Whereas, in Com. v. Goodhue, 2 Met. (Mass.) 193, the indictment was for rape and the conviction for incest, the latter being included in the former.

In each of these cases it will be seen that the basis of the opinion is that whatever other crime defendant might be guilty of, he was *not* guilty of the particular crime of incest or seduction as the facts would not sustain the statutory definition of those offenses, and the decisions are not referable to the technical doctrine of merger as defined by Bishop and other law-writers. Those cases do not determine that one criminal transaction may not present combinations which leave an election in the State in dealing with the offender. Thus, robbery is larceny aggravated by the fact that goods are taken from the person of the owner by violence or putting in fear.

Blackstone, book, 4, p. 243, says: "Open and violent larceny from the person, or robbery, the *rapina* of the civilians, is the felonious and forcible taking, from the person of another, of goods or money to any value, by violence or putting him in fear."

In Bonsall v. The State, 35 Ind. 462, it was ruled that, where one is indicted for larceny, and the evidence shows he might have been indicted for robbery, and therefore the State has arraigned him for a less aggravated crime than that of which he is really guilty, he can not complain."

In Hicky v. The State, 23 Ind. 21, the defendant was in-

dicted and convicted for grand larceny, but the proof showed he had committed robbery and it was argued in his behalf that the conviction was erroneous, but the Supreme Court held otherwise, saying larceny was included in robbery, and, as a general rule, "a criminal person may be holden for any crime, of whatever nature, which can be carved out of his act," citing 1 Bishop's Crim. Law, sections 419, 536, 682; vol. 2, secs. 966, 973, 675, 410, 707; Lewis Crim. Law, 450, 455, 466; People v. McGowan, 17 Wend. 386.

Applying this principle to the statute before us and granting that the defendant might have been indicted and convicted for rape, a crime of the most atrocious character, which involved a forcible violation of the person of the prosecutrix, how can the defendant complain because the State has elected to prosecute him for a violation of her person under this statute in which it is unnecessary to prove a forcible deflouring of the prosecutrix?

In what does it differ from a prosecution for larceny, when the proof shows robbery, or for manslaughter when the proof shows murder, or for 'murder in the second degree when the proof shows murder in the first degree?

Upon mature consideration we are fully satisfied that the construction given this statute in State v. Knock, 142 Mo. 515, was correct, and that the criminal court correctly ruled that proof of force did not entitle the defendant to an acquittal, every essential of the crime being otherwise proven, and it follows that State v. Ellis, 74 Mo. 385, and the cases named which have followed it, should on this point no longer be followed.

As to the sufficiency of the evidence to sustain the verdict of the jury, the testimony of the witnesses was heard by the jury. The jury had an opportunity of seeing them and observing their demeanor, on the stand, and it was their peculiar province to weigh their testimony and believe or disbelieve it.

They believed the prosecutrix and did not believe the defendant's witnesses.

The verdict has been approved also by the judge of the criminal court who also had the advantage of seeing the witnesses and observing their manner.

We discover no such evidence of prejudice or partiality as would justify us at this distance in rejecting the verdict of the jury, and the judgment should accordingly be affirmed.

*Robinson, Brace* and *Valliant, JJ.,* concur *in toto; Burgess, C. J.,* concurs in the opinion as to the law of the case, but thinks the judgment should be reversed and the case remanded for further trial upon the ground of the want of substantial evidence to sustain the verdict; *Sherwood* and *Marshall, JJ.,* dissent, and express their views in a dissenting opinion by *Sherwood, J.*

SHERWOOD, J. *(dissenting).*—This appeal comes from Buchanan county, and was taken because defendant was convicted under an indictment bottomed on the violation of the prohibition contained in section 1838, Revised Statutes 1899, and his punishment assessed at one month's imprisonment in the county jail, and the payment of a fine of $500.

The cited section, enacted in 1895, is the following: "If any person over the age of sixteen years shall have carnal knowledge of any unmarried female, of previously chaste character, between the ages of fourteen and eighteen years of age, he shall be deemed guilty of a felony, and upon conviction shall be punished by imprisonment in the penitentiary for a term of two years, or by a fine of not less than one hundred dollars nor more than five hundred dollars, or by imprisonment in the county jail not less than one month or more than six months, or by both such fine and imprisonment, in the discretion of the court."

Immediately above the section quoted, is section 1837 of the same revision, and reads in this way:  "Every person who

shall be convicted of rape, either by carnally and unlawfully knowing any female child under the age of fourteen years, or by forcibly ravishing any woman of the age of fourteen years or upward, shall suffer death, or be punished by imprisonment in the penitentiary not less than five years, in the discretion, of the jury."

The section last above mentioned has, with some modifications as to punishment, been on our statute books ever since section 23, p. 170, Revised Statutes 1835, was enacted, and probably before that time.

In 1879, section 1253 was enacted, and there an amendment occurred, which so amended section 23, General Statutes 1865, p. 780, as to suffer the awarding of the penalty of death, and also added the words, "in the discretion of the jury." Such amendment made the law as it is to-day.

But as far back as section 10, 1 Revised Statutes 1855, an offender, whose offense was punishable by imprisonment in the penitentiary for a term not less than any specified number of years, and no limit to duration of such punishment declared, the offender might be imprisoned during his natural life, or for any number of years not less than those prescribed. [Gen. Stats. 1865, p. 826, sec. 10; R. S. 1879, sec. 1660; R. S. 1889, sec. 3955; R. S. 1899, sec. 2375]. So that those words, "in the discretion of the jury," seem to have added naught to the force and effect of the given section. The pertinency of these prefatory observations, and the citation of the above sections, will appear in the following investigation.

Defendant makes assertion that section 1838 is unconstitutional in that it deprives defendant of the right of trial by jury as guaranteed by section 28, article 2 of our State's Constitution, which declares: "The right of trial by jury [as heretofore enjoyed] shall remain inviolate." The bracketed words show the difference between a corresponding section and article in the Constitution of 1865, and the section above quoted, and the words added to the latter. It has been ruled

respecting these words that whatever was the *status* of that right *at the time* the Constitution of 1875 was adopted, was the *status* referred to in that instrument. [State v. Bockstruck, 136 Mo. loc. cit. 358, and cas. cit.; Ice Co. v. Tamm, 138 Mo. 385, and cas. cit.]

In Michigan, the provision of the Constitution of that State, similar to our own, is this: "The right of trial by jury shall remain." Under that provision, a statute was challenged as to its constitutionality, which authorized persons charged with cutting timber on State lands, to be tried in some county other than that in which the offense was committed. Discussing that statute in the light of that constitutional provision, Judge COOLEY characterized the act as not only tyrannical and oppressive but manifestly in conflict with one of the plainest and most important provisions of the Constitution. Proceeding further, that jurist observed: "The right is to remain. What right? Plainly the right as it existed before; the right to a trial by jury as it had become known to the previous jurisprudence of the State. [Underwood v. People, 32 Mich. 1.] The right is not described here; it is not said what shall be its incidents; it is mentioned as something well known and understood, under a particular name; and by implication at least, even a waiver of its advantages is forbidden. If the accused himself can not waive them, plainly the Legislature can not take them away. The next section of the Constitution repeats the guaranty of this method of trial 'in every criminal prosecution,' and nothing is better settled on the authorities than that the Legislature can not take away a single one of its substantial and beneficial incidents." [Swart v. Kimball, 43 Mich. loc. cit. 448.]

At common law the jury impaneled to try a criminal cause could, when finding against the defendant, either bring in a verdict of guilty (whereupon the court fixed the punishment), or else make a special finding of facts and leave the result of determining the fact of guilt, and also of fixing the

State v. Hamey.

duration of amount of the punishment to the court; to use the language of BLACKSTONE in regard to the verdict in such cases, he says: "And such public or open verdict may be either general, guilty, or not guilty; or special, setting forth all the circumstances of the case and praying the judgment of the court, whether, for instance, on the facts stated, it be murder, manslaughter, or no crime at all. This is where they *doubt* the matter of law, and therefore *choose* to leave it to the determination of the court; though they have an unquestionable right of determining upon all the circumstances and finding a general verdict, if they think proper to so hazard a breach of their oaths, and if their verdict be notoriously wrong, they may be punished and the verdict set aside by attaint at the suit of the king, but not at the suit of the prisoner."  [4 Bl. Com. (Lewis's Ed.), 361.]

And under the common law a defendant on trial for a felony had no constitutional right to have the measure of his punishment fixed by a jury.  [Ib., 2 Hal. P. C. 310.]

Not only was a prisoner at common law denied the right of having the measure of his punishment determined by a jury, but even when the jury found a verdict in favor of the accused, such verdict was liable to be set aside, if in the opinion of the trial judge it was "notoriously wrong," and the jury were punished and their verdict set aside by attaint at the suit of the king, but not at the suit of the prisoner, in case of his conviction.  Such was the right of trial by jury in its sum total, in its *tout ensemble,* as it was known, practiced and existed at common law.  Was there any change in this State in regard to that right and in the methods of its practice as known and practiced at common law ?  Yes, changes most radical were effected, at least as early as the statutes of 1835, which provided: "Where the jury find a verdict of guilty, and fail to agree on the punishment to be inflicted, or do not declare such punishment by their verdict, or assess a punishment not authorized by law, and in all cases of judgment on

confession, the court shall assess and declare the punishment, and render judgment accordingly." [R. S. 1835, p. 493, sec. 4; R. S. 1845, p. 883, sec. 4; 2 R. S. 1855, p. 1196, sec. 5; Gen. Stats. 1865, p. 852, sec. 5.]

And the statutes since 1825 have fixed the punishment to be awarded for murder in the first degree. [Revised Laws 1825, p. 282, sec. 3; R. S. 1835, p. 168, sec. 3; R. S. 1845, p. 344, sec. 3; 1 R. S. 1855, p. 559, sec. 3; Gen. Stats. 1865, p. 778, sec. 3.] That punishment is death, and has so continued down through every subsequent revision. That punishment is assessed by *the law,* and with its assessment neither jury nor court have any hand or concern whatever. And for this reason, it is a matter wholly irrelevant to the present discussion to examine what the court could do under the territorial laws, in regard to fixing the punishment in murder and rape cases. Such investigations savor too much of the last-year's-bird's-nest theory; as well might we go back to the French laws that prevailed in this country prior to the "Louisiana Purchase."

The common law in its right of trial by jury has never prevailed in this State, so far as our reports and statutes show; certainly not since 1835. Since that period such a verdict as a special verdict in a criminal case as above described, or the setting aside of a verdict by attaint at the suit of the State when in favor of a defendant because "notoriously wrong," and the punishment of a jury for returning such wrong verdict, have never been known in this State. And yet those things were part and parcel, were but incidents and concomitants of the right of trial by jury as known and practiced at common law.

With matters in this statutory posture; with the duties of a jury in returning a verdict and of the court when such verdict should be returned, firmly and explicitly established by positive law, and with our jurisprudence in regard to such matters settled by not infrequent decisions of this court, the

Constitution of 1875 was adopted. What does that Constitution say touching the point in hand? It says: "The right of trial by jury (as heretofore enjoyed) shall remain inviolate." Enjoyed where, when or how? Enjoyed as it existed *at common law?* Enjoyed as it existed in *England?* Enjoyed as it existed when this State was a territory? The Bill of Rights does not thus declare. Had it been intended that that right was to be measured and defined by its definition and limitations as known and existing at common law, then the framers of our Bill of Rights were singularly unfortunate in their use of language. Had they designed to perpetuate the right as it existed at common law, they would have so declared in terms too plain to be misunderstood. They said "as heretofore enjoyed." Enjoyed where? why here in *Missouri,* and not in any foreign country. Enjoyed as it had been laid down in our statutes and expounded in our frequent decisions, prior to the adoption of the Constitution of 1875; that is what was meant, and only that. And this court has so decided in State v. Bockstruck, 136 Mo. loc. cit. 358.

For *sixty-seven years* the right of trial by jury has been enjoyed in this State as pointed out in our statute and practiced in our courts, and now at this late day we are gravely told that in spite of nearly three-quarters of a century of statutory definition and judicial practice and exposition, the Legislature could, at a word, wipe out all these statutory provisions; wipe out the twenty-eighth section of the Bill of Rights, and restore to full vigor the common-law right of trial by jury, with all its crudities, injustice and barbarisms. I do not believe it.

In Ice Co. v. Tamm, 138 Mo. 385, touching the right of trial by jury, quotation is approvingly made from Edwardson v. Garnhart, 56 Mo. 81, where Judge VORIES said: "It is not to be presumed that the provision of the Constitution relied on was intended to change the law as it then existed and

Vol 168 mo—14.

had been practiced in the State for a quarter of a century; the object of the framers of the Constitution must have been to preserve the right of trial by jury, as it *then* existed and had been practiced in this State, *and not to establish a new rule of practice on that subject.* This, then, was the state of the law when the Constitution of 1875 was framed and submitted to the people of Missouri for adoption. As then understood and construed by the court of last resort in this State, neither the Constitution of 1820 nor that of 1865 prohibited the courts from referring cases without the consent of either party in the cases mentioned in the statutes. The right to a jury trial then was modified to this extent by this power to appoint referees. These references had been sanctioned by the statutes, and the opinions of the Supreme Court many years before that Constitution was framed and when the people adopted it, they ratified the provision as to jury trial as it had been enjoyed previously thereto; that is to say, they adopted it with the construction already placed upon it; otherwise, the words 'as heretofore enjoyed' are utterly meaningless." And it was further said in that case in concluding the opinion: "As the statute itself is an exception to the right of trial by jury, we shall not extend it by loose construction."

If the language just quoted is good law as to a *reference* case, why not equally good and equally applicable to the case at bar? If not, why not?

I take it then, as twice decided by this court, the Constitution of 1875 upon its adoption had the effect to perpetuate and place beyond legislative interference any beneficial or favorable incident pertaining to the right of trial by jury as it existed at the time that Constitution was adopted. Among those substantial, favorable and beneficial incidents pertinent to such right, was the coincident right to *have the jury assess the punishment* in all cases of felony. And, of course, the constitutional provision and guarantee that "the right of trial by jury as heretofore enjoyed, shall remain inviolate," would

apply as well to all newly-created felonies as to those in existence when the present Constitution was adopted. This point has passed into precedent.

Thus in the Court of Appeals of New York it is said: "'Trial by jury in all cases in which it has heretofore been used shall remain inviolate forever,' is broad enough and efficacious enough to secure it. The expression, 'in all cases in which it has heretofore been used,' is generic. It does not limit the right to the mere instances in which it had been used, but extends it to such new and like cases as might afterwards arise. For instance, felonies were triable only by juries. I do not doubt that all new felonies must be tried that way, and that by force of this section. . . . The other section does require it, as well in new felonies as in old, because they belong to the class of cases in which, at the adoption of the Constitution, such a trial was used." [Wynehamer v. People, 13 N. Y. loc. cit. 426; see, also, Colon v. Lisk, 60 Am. St. 609.]

The Attorney-General, however, says: "It must be remembered the Constitution of Missouri is not a grant of power to the General Assembly, but a restriction, and if there is no provision in it that prohibits the General Assembly from providing for the court assessing the punishment, then the General Assembly has the power to do so."

But this assertion overlooks the well-settled rule of constitutional construction on this point. An eminent jurist and author says: "Another rule of construction is, that when the Constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference to add to the condition, or to extend the penalty to other cases. On this ground it has been held by the Supreme Court of Maryland, that where the Constitution defines the qualifications of an officer, it is not in the power of the Legislature to change or superadd to them, unless the power to do so is expressly or by

necessary implication conferred by the Constitution itself.
Other cases recognizing the same principle are referred to in
the note.  .  .  .  We are not, therefore, to expect to find in
a Constitution provisions which the people, in adopting it,
have not regarded as of high importance, and worthy to be
embraced in an instrument which, for a time at least, is to con-
trol alike the government and the governed, and to form a
standard by which is to be measured the power which can be
exercised as well by the delegate as by the sovereign people
themselves.  If directions are given respecting the times or
modes of proceeding in which a power should be exercised,
there is at least a strong presumption that the people designed
it should be exercised in that time and mode only; and we
impute to the people a want of due appreciation of the purpose
and proper province of such an instrument, when we infer that
such directions are given to any other end.  Especially when,
as has been already said, it is but fair to presume that the
people in their Constitution have expressed themselves in care-
ful and measured terms, corresponding with the immense im-
portance of the powers delegated, and with a view to leave as
little as possible to implication." [Cooley on Const. Lim.
(6 Ed.), pp. 78, 79, 93, 94.]

Touching the same topic, DENIO, C. J., says: "But the
affirmative prescriptions, and the general arrangements of the
Constitution, are far more fruitful of restraints upon the Leg-
islature.  Every positive direction contains an implication
against anything contrary to it, or which would frustrate or
disappoint the purpose of that provision.  The frame of the
government; the grant of legislative power itself; the organiza-
tion of the executive authority; the erection of the principal
courts of justice, create implied limitations upon the lawmak-
ing authority as strong as though a negative was expressed in
each instance." [People v. Draper, 15 N. Y. 544.]

These authorities distinctly show that the doctrine of
"affirmative specification excludes implication," and that that

and the similar rule or maxim of *"expressio unius,"* etc., applies alike to constitutions and to statutes; and so this court has held in Bank v. Graham, 147 Mo. loc. cit. 257. To the like effect see Ex parte Joffee, 46 Mo. App. loc. cit. 365, and cas cit.

But it is contended that even if that portion of section 1838 be held invalid, which authorizes the court to assess the punishment, yet that this part may be separated from the rest of the section and the section being thus *expurgated,* could still stand as a valid enactment. In some instances this may be done. Discussing this point, this court said: "Now nothing is better settled than that a part of a law may be declared constitutionally invalid, and yet another portion properly separable therefrom, and therefore unexceptionable in every particular. This may be so even though the sound and unsound are in one section together. This is always the rule unless the parts sound and unsound are so mutually related, so blended together, as to constitute an entirety, making it evident that unless the act be carried into effect as a whole, it could not have received the legislative sanction. Bishop, Stat. Crim., sec. 34, and cas. cit." [State v. Bockstruck, 136 Mo. loc. cit. 353.]

A similar view was expressed in Landis v. Vineland, 54 N. J. L. 75. In that case, an ordinance created an offense and prescribed the penalty for its violation. That portion of the ordinance prescribing the penalty was held to be void, and the question presented to the court was whether the residue of the ordinance declaring what should be an offense was also invalidated. The court said: "The principle to be applied is, that if a part of a law be void, other essential and connected parts are also void; but, where that part which is bad is independent and not essentially connected with the remainder, the latter will stand. In applying this principle, the question to be decided is, whether it is clear that, if the void part of the enactment be obliterated, the residue will still express that

which the Legislature intended to become a law and which is enforcible as law. In the present case the mayor and council ordained that certain acts should be visited with a fine not exceeding $10. Is it clear that they intended that such acts might be visited with a fine of $20? Is it clear that, if they had understood that the penalty might amount to $20, they would have defined the prohibited conduct in the same terms? I think not. The misconduct and the penalty denounced by them must have been connected in their minds as essential parts of a single law. If the court should substitute the statutory penalty for that fixed in the ordinance, a law would be framed which the legislative power has not expressed its intention to enact."

Touching this subject, an eminent author and jurist observes: "If they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the Legislature intended them as a whole, and if all could not be carried into effect the Legislature would not pass the residue independently, then if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them." [Cooley, Const. Lim. (6 Ed.), 211, 212.]

And in a note to the above, the same author very acutely remarks: "It must be obvious, in any case where part of an act is set aside as unconstitutional, that it is unsafe to indulge in the same extreme presumptions in support of the remainder that are allowable in support of a complete act when some cause of invalidity is suggested to the whole of it. In the latter case, we know the Legislature designed the whole act to have effect, and we should sustain it if possible; in the former, we do not know that the Legislature would have been willing that a part of the act should be sustained if the remainder were held void, and there is generally a presumption more or less strong to the contrary. While, therefore, in the one case

the act should be sustained unless the invalidity is clear, in the other the whole should fall unless it is manifest the portion not opposed to the Constitution can stand by itself, and that in the legislative intent it was not to be controlled or modified in its construction and effect by the part which was void." [Ib. 212.]

An instance of holding the whole act invalid because of the invalidity of a portion of it, occurred in Texas: there, a statute made the same provision for taxing telegraph messages sent to points within and to points without the State, and was void as to the latter, it was held wholly void. [Western Union Tel. Co. v. State, 62 Tex. 630.]

In the case at bar it is by no means either clear or probable that the Legislature would have enacted the section in dispute, unless the clause giving the *court* the right to assess the punishment had been inserted. Including the various degrees, our criminal code of this State defines and punishes *over three hundred felonies* and in *every one* of them (except where the punishment is fixed by law, as in murder in the first degree) it is the duty of the jury to assess the punishment; and the only instance known to our laws where the court has a discretion to assess the punishment is where a violation of section 1838 is prosecuted to a conviction. In *every other* instance, the punishment is to be assessed by the jury if they agree. [R. S. 1899, sec. 2648.] And if they find a defendant guilty and fail to agree on the punishment, or to declare it in their verdict, or assess a punishment not authorized by law, then, and then only, can the court assess and declare the punishment. [R. S. 1899, sec. 2649.] In other cases, where the jury agree, but bring in a verdict below the limit of legal punishment, there the court must raise the punishment to the lowest legal limit. [R. S. 1899, sec. 2650.] Or if the jury in their verdict assess a punishment higher than the legal limit, there the court must fix the punishment at the highest legal limit. [R. S. 1899, sec. 2651].

Under section 2652, Revised Statutes 1899, the court is authorized to reduce the punishment assessed by the jury. These sections have been on our statute books ever since 1835, and perhaps for a longer period, and come down to General Statutes 1865, and are still the law.

These statutes heretofore quoted, constituted the sum total of the right of trial by jury as understood and practiced when the Constitution of 1875 was adopted; and they explicitly delimited the respective provinces of court and jury as to assessment of punishment in criminal cases, and such delimitations became, to all intents and purposes, part and parcel of that Constitution upon its adoption.

Considering the fact that of all the felonies punishable under our statutes, the one denounced in section 1838 is the *only one* where, the jury not having failed to agree, the court has to fix the punishment, it seems beyond rational belief that the Legislature should have so drawn that section, thereby causing it to differ from all our other penal statutes, unless upon the hypothesis of having their intent, aim and purpose concentrated on the sole design of carrying the act into effect *as a whole,* whereby, the right of trial by jury, as heretofore enjoyed, should be so far *modified;* that for *their* discretion should be substituted the discretion of the court; unless, also, as suggested in Landis' case, supra: "The misconduct and penalty denounced by them must have been connected in their minds as essential parts of a single law." Considering the litigated section in every possible way both on reason and authority, the section should be held invalid for the reasons heretofore stated, and that such invalidity taking its origin in the clause which confers unwarranted discretion on the court, permeates, with its poison, the whole section and causes it to fall under the ban of the Constitution.

And just here I wish to make a few additional observations: The assertion has been made that: "The change in the tribunal or agency which shall assess the punishment which

the law prescribes in no manner deprives the defendant of any of the substantial rights secured by the right of trial by jury as at common law or as enjoyed under the laws of this State prior to 1875." But this is *mere assertion.* The one-man power has always been carefully guarded against and restricted both in the civil and criminal statutes, practice and jurisprudence of this State. But we are not here to inquire whether the allowing of a judge to assess the punishment in a criminal case would be just as fair to the defendant as if assessed by a jury. The question is, what has section 28 of the Bill of Rights ordained in this regard? But even were we to look at the Bill of Rights as contemplated in the assertion just quoted, still the odds would be against the correctness of that assertion.

Speaking of the one-man power and the danger of its unrestricted exercise in determining matters of *mere fact* by a judge, Judge COOLEY, quoting from BLACKSTONE, says: "In settling and adjusting a question of fact, when intrusted to any single magistrate, partiality and injustice have an ample field to range in; either by boldly asserting that to be proved which is not so, or by more artfully suppressing some circumstances, stretching and warping others, and distinguishing away the remainder [3 Bl. Com., 380]." Upon this Judge COOLEY remarks: "These are evils which the jury trial was designed to prevent." [Cooley's Const. Lim., 392.]

Our legislators and our constitution-framers were doubtless aware of the mentioned danger of the one-man power; and therefore carefully guarded every avenue against its stealthy approaches and its insidious advances.

Again, the assessment of the punishment to be inflicted is part and parcel of the *issue* joined between the State and the prisoner. If the verdict omits to find a part of the issue, to-wit, the punishment to be assessed, it is as fatal to the validity of the verdict as is the failure to find the accused *guilty.*

[Wynn v. State, 1 Blackf. 28, and cas. cit.; 1 Bishop New Crim. Law, sec. 1012.]

So that if in spite of positive statutory law in existence on our statute books, and practiced daily and adjudicated in our courts for *forty years,* in regard to the right of trial by jury, a practice sanctioned by its adoption by the Constitution of 1875, the Legislature can take away from the jury the power to find *a part of the issue,* to-wit, the punishment to be assessed, and still that law be constitutional, no reason can be given why a law would not be equally constitutional which should take away from the jury the power to find the *other part* of the issue, to-wit, the guilt of the accused, and leave that, also, to be determined by the court. This is so, and you can not deny it.

Moreover, to further illustrate the point of the assessment of the punishment being a part of the issue, suppose that the jury in an ordinary case of felony should bring in a verdict of guilty, could the prisoner waive the assessment of the punishment by the jury, and successfully call upon the court to assess the same? Certainly not. If then the accused could not waive the assessment of the punishment by jury, then, according to Judge Cooley, plainly the Legislature could not take it away. [Swart v. Kimball, supra.]

Having discussed the chief constitutional question involved in this cause, it is proper to take up for examination that feature of the cause which constitutes the main ground on which defendant's appeal is bottomed, to-wit, the entire insufficiency of the evidence to support the verdict.

The prosecutrix, as will presently more fully and at large appear, testified to a clear case of *rape.* Defendant upon this, and at the close of the testimony, asked this instruction: "If you believe from the evidence that the defendant had sexual intercourse with the prosecuting witness, Jessie Champagne, but that such intercourse was against the will and consent of said Jessie Champagne, and was had by means of force and violence used by said defendant, and that said Jessie Cham-

pagne resisted having such intercourse, then you will acquit the defendant."  ·

Comparing section 1837, supra, with its associate section (1838), we find that they respectively define totally distinct and independent crimes; the first, a crime of force, violence, or intimidation or a combination of all these three; the second, the ordinary instance and illustration of the "Irrepressible Conflict" where mutual desire seeks and finds its outlet and gratification.    But this, the law, where the parties are of a certain age, tabooes.    There is neither likeness nor similitude between the crimes described in the two sections; neither as to their ingredients nor their punishments.    The highest punishment of the first is death; its lowest, imprisonment for five years; while the highest punishment which can be inflicted under the second is imprisonment for two years; the lowest, one month's imprisonment and a fine of $100.

These considerations clearly show that the crime designated in 1838 is not one of the lower degrees of the crime described in 1837.    If it could be thus justly regarded, it would be only upon the theory that 1838 applies to *all* cases of carnal knowledge by a man over sixteen with a chaste unmarried female between the ages of fourteen and eighteen years, whether *with* the consent of such female, or *forcibly and against her will;* and that such man, though proven guilty of *rape,* could be convicted of mere *carnal knowledge.*    And if the offense described in 1838 could be regarded as one of lesser degree than that described in 1837, then it would follow that a man could be indicted under *that* section, and on proof of mere carnal knowledge, convicted under 1838.    Nay, more, counts for rape and for carnal knowledge could be united in the same indictment, and a conviction occur as the evidence might turn out to be; while our statute only allows such counts to be united "when, by law, an offense comprises different degrees," and there, the "indictment may contain counts for the different degrees of the same offense."    [R. S. 1899, sec. 2524.]

Furthermore, if mere carnal knowledge as designated in 1838, is one of the degrees of the crime of rape; if that word is a mere *generic* term for *all* sexual offenses, then a far more comprehensive and far-reaching result would follow than that already announced; because, then, an indictment could contain counts for rape, for carnal knowledge, for defiling a girl under one's protection by carnally knowing her (R. S. 1899, sec. 1845); for seduction (R. S. 1899, sec. 1844); and for incest (R. S. 1899, sec. 2172).

But such a theory would require great temerity to attempt to maintain it. Especially so, as this court has expressly decided that where *rape* is proven, *incest* ceases. [State v. Moses Ellis, 74 Mo. loc. cit. 386, and cas. cit.] Especially so, as this court has three times decided, in State v. Woolaver, 77 Mo. 103; State v. Strattman, 100 Mo. 540; State v. Lingle, 128 Mo. 528, that under section 1845, if *force* be used, there can be no conviction of the offense therein mentioned.

Now, if proof of *force* defeats the indictment under section 1845, and defeats it under section 2172, why does it not logically do so under section 1838? This question suggests the only reasonable answer that can be returned, and that is, that *it does*.

Again, we have statutes declaring in effect that a party can not complain, and is not entitled to a reversal because not convicted of a higher offense than that with which he is charged, or where he is found guilty of an offense necessarily included in that charged against him. [State v. Gates, 130 Mo. loc. cit. 357, and cas. cit., and stats. cit.] Now, evidently, this court did not consider in Ellis's case, supra, that the crime of incest was necessarily included in the crime of rape, nor that the latter was a higher degree of the same offense, because, had it done so, it must, as of course, have affirmed the judgment of conviction, and the same remark applies to the Woolaver, Strattman and Lingle cases, above cited, where this court would evidently have reversed the

State v. Hamey.

judgment of conviction had the crime of rape been proven. Tested by these considerations, and tried under these rules, it is difficult to see how a like conclusion can fail of being reached in the case before us. If consent prevents rape and convicts of incest, or if rape predominates and prevents conviction of incest, or if rape intervening, where a guardian defiles his ward by carnally knowing her, prevents conviction under section 1845, how can it with any show of reason be said that having carnal knowledge under section 1838, by means and through instrumentality of rape, authorizes a conviction under that section? How can carnal knowledge be obtained without consent, defeat prosecution in the two classes of cases before mentioned, and yet fail to do so under the provisions of 1838? The theory of the State on this point, reduced to its last analysis, renders it possible for the grand jury or the prosecuting attorney *to elect* under which section, 1837 or 1838, the accused shall be prosecuted for the *very same act.* If the case is pretty strong against him, indict him under section 1837; if the case be regarded weak, indict under section 1838, and then all you have to prove is the carnal knowledge; and if in doing so you prove a clear case of rape, this amounts to no defense. Men who are tried for crime must not be too nice as to the *number* of the section under which they are indicted. What does it concern them whether the last figure of the number of the section is a 7 or an 8? Further under this head: If the theory of the State be correct, and if it be true that the offense mentioned in 1838 is not one of the degrees of the offense mentioned in 1837, then the State has the option, for the same act, to indict under *either* section, and if defeated on the first one, may indict under the second, and *vice versa,* and a judgment of acquittal would be no bar, to a second prosecution under the other section. And just here this additional thought occurs, and presents itself in the form of this query: If the accused must be apprised, by the indictment, of "the nature and cause

of the accusation" (sec. 22, art. 2, Const.), how is this right preserved, where he is indicted for one thing, proven guilty of another, and still convicted under the groundless and unproven charge?

These remarks bring into view State v. Knock, 142 Mo. 515, on which the State relies. I am abundantly satisfied, since pursuing the above train of thought in the light of the authorities and statutes cited, that that case on the point of force being immaterial under section 1838, was erroneously decided, and should no longer be followed. But the error on that point was harmless, since no force was there in evidence, and so the remark was of the *ober* variety, but which sometimes is as damaging as a direct out-and-out ruling. The instruction above mentioned should therefore have been given.

We come now to the predominant reason which induced this appeal, to-wit, the utter insufficiency of the evidence to warrant a conviction. The testimony of the prosecutrix, on which alone this prosecution rests, is, in its substance and practical totality, the following:

The story of the occurrence, as told by Jessie Champagne, the prosecutrix, is this: At the time of the assault, June 7, 1899, she had passed sixteen years of age. While she was yet an infant her mother died, and she was reared by Mrs. Mary Irwin (the mother-in-law of the defendant) with whom she lived from the time she was three years of age, in a two-room cottage on the farm of Sylvester Hamey, the defendant's father, near Lake Contrary, in Buchanan county. In another house, situated in the same yard, on the same farm, and only thirty yards distant from where Mrs. Irwin and the prosecutrix lived, the defendant with his wife and three children, the oldest eleven and the youngest three years of age, the defendant's father, and the prosecutrix's father, resided and were actually present in that other house at the time of the supposed outrage. The defendant was thirty-six years old, and had lived on this farm all his life. The prosecutrix had known

him intimately since she was a child.   One evening in June, 1899, after supper, Mrs. Irwin went over to the defendant's house to help Mrs. Hamey wash her dishes.   It was about 8:30 o'clock, dusk and getting dark.   The prosecutrix was alone in the house.   She stood in the front room combing her hair.   Some one entered, "grabbed her around the waist," and kissed her.   She jerked herself free, and turning, recognized the defendant.   She ran towards the door, but before she could escape, he caught her again, and dragged her to a bed in the room.   He threw her upon the bed and forced a pillow over her mouth.   She struggled in vain to free herself. She tried to halloo but, for the pillow, she could not.   Presumably, holding the pillow with one hand, and controlling her hands with his other hand, in some manner, not clearly explained by the witness, he raised up her clothes, and while she resisted with all her power, he ravished her.   When he "let her up," the defendant said:   "My God, Jess, don't tell my wife," and went over to his own house.   The prosecutrix testified that she was a pure, innocent girl, that she had never had intercourse with any man, nor did any man ever attempt to have intercourse with her; and yet she admits that at the time she was raped, the doors to her home, and to the defendant's home, were open; that at the time her foster mother, her father, the defendant's father and his wife, were in the house in the same yard, not ninety feet away, and though it nowhere appears that "she was under restraint or the influence of threats, or that she apprehended any violence from the accused," she did not, after the pillow was removed from her mouth, and the defendant had departed in peace, halloo or make any outcry, or exhibit the anguish that might with all propriety, have been expected from one so pure and innocent; but on the contrary, she testified that when defendant left, she went out on the front porch and sat down to cool off.   She says she waited there for her foster mother to return, and that "I kept intending to tell her but I didn't;" and the prose-

State v. Hamey.

cutrix admits that she made no complaint to her, nor to her father, nor to the defendant's wife, nor to any other person, then or at any other time, giving no excuse for her failure to tell her mother, giving as her only excuse for her failure to tell her father, who was only thirty yards away, that she did, think she would, but she was ashamed to; and giving as the excuse for failure to complain to the defendant's wife, "Well,, I don't know, did not think she would believe it anyhow."

She further testified that she never told her foster mother as to what had occurred; never told a soul until *after the child was born;* and *then* she told her foster mother. And she never told her until the latter *asked her*: "Jessie who was the cause of this?" And Jessie said, "John Hamey." This answer was given in response to the State's question: "Who was the cause?" over defendant's objection and exception on the ground that the answer would be hearsay. After the alleged rape, and down, at least, to the cornfield incident, three months after the child was born, the same bearing, attitude and friendly actions which had existed and were customary between defendant and Jessie, before the episode of the bed and the pillow in her room on the night in June, continued to exist without a break in their uniformity.

The wife of the defendant testified, corroborating Mrs. Irwin, the State's witness, that during all the time that elapsed from the alleged assault until defendant's arrest, she and the defendant and her father-in-law and Mrs. Irwin and the prosecutrix visited each other, and that she never saw any change whatever in the conduct, relations or feelings that had existed between the prosecutrix and the defendant before the crime.

Defendant's family, consisting of a wife and three children from three to eleven years old, with defendant's aged father, his mother-in-law, the prosecutrix, whom defendant had known all her life, and her father, all continued to live in the same yard together, with no discontinuance whatever in

their former amicable relations, they all, including Jessie, continued to visit each other as before, and were in fact as one large family.   Meanwhile, with all these friendly rela-, tions still in *statu quo ante,* and after the requisite time had elapsed, when signs of motherhood began to be largely and more largely developed, Mrs. Irwin, the foster mother, re- marked to Jessie: "It looks funny that you are sick all the time," and she replied: "Oh, ma, you always say something." This conversation occurred along late in the fall, after the affair in June.

It furthermore appeared from the testimony of the prose- cutrix that, although she and the defendant continued to live within ninety feet of each other, she never spoke to him nor, he to her about the connection which had taken place between them, until about three months after the child was born. Then, one day, about a year after the incident, the defendant and her father were plowing in the field and prosecutrix went to defendant there, and asked him to *support her child.*   The two were alone.

Responding to this request defendant denied its being his child; that he had nothing to do with it, and wouldn't support it; and further said: "Oh, no, Jessie, you can't come that."   Thereupon the defendant asked Jessie whether she had told her father about the matter, and when she replied that she had not, defendant suggested that they go and tell him.   They went together.   The defendant told the father that the prosecutrix had said that he was the father of the child, but that he had nothing to do with it.   *He refused to pay any money, and then she had him arrested.*   The wit- ness did not testify, nor is there any evidence in the case, that as a result of the outrage committed upon her, she was lacerated, or that she bled, or that her person was scratched, or showed any marks of violence, or that any of her clothing was disordered or torn, or that she cried or gave any signs

Vol 168 mo—15.

of the physical condition and mental agitation, which by all the immutable laws of nature must follow upon a rape of a resisting virgin, and such as would naturally be expected from a woman so foully wronged. This is the State's entire story. No other witness was introduced to prove, by fact or circumstance, the guilt of the defendant.

In addition to that the prosecutrix was contradicted by defendant (who established an excellent reputation) as to what had occurred in her room in June, 1899, and contradicted by Mrs. Irwin and defendant's wife in many important matters aside from her testimony as to the June occurrence, and contradicted by other witnesses as to the other important statements of hers. It will have been observed that the prosecutrix had never, by word, sign or syllable, indicated to a single human being that she had been ravished. She never even said so when she went to defendant in the cornfield; she only asked him to support her child. Now if defendant had really *ravished* her, it would have been the most natural thing in the world for her to have indignantly gone to him, and charged that he had forcibly despoiled her of her virtue; pillaged her of her chastity, and accomplished her ruin. Instead of that, however, she says nothing of outrage committed and chastity lost; at *that* time, she appears to have been unaware of either loss of virtue or of honor outraged. Her only concern was of a *financial nature; to receive funds to support the child* and when defendant denied its paternity, and refused its support, she had him arrested. And not until she went on the witness stand in court, did she declare she had been *ravished.* And in this case, at no time does prosecutrix even so much as intimate that she was threatened by defendant, if she told what had occurred, or that she was in any way intimidated by him.

It is believed that no instance can be found in the books where a prosecutrix has been allowed to testify against an accused party, charging him with rape upon her, after so long

and unexplained a delay has occurred, with every opportunity
to make complaint, and without a single excuse to urge or offer
for the delay, nor why complaint was not made at an earlier
period; and without a single circumstance of fear, threat or
intimidation to prevent a prompt and full disclosure.   More
than that, the prosecutrix stands without a particle of corrob-
oration, either as to immediate complaint made; the torn and
disordered condition of her hair or clothing; scratches or
bruises on her person; or that she was in tears or great mental
distress; or even that the ravisher fled for it. · And on top of
that she is contradicted by Mrs. Irwin, her foster mother, as
to whether, prior to the assault, she "kept company" with other
young men; Mrs. Irwin affirming; prosecutrix denying.   In
this she was contradicted also by John McComb and Ernest
Bally, who testified on behalf of defendant, that they did
"keep company with her," and had had sexual intercourse
with her prior to the time of the alleged assault by the de-
fendant.   And these two witnesses are corroborated by Mrs.
Irwin, who also testifies that the prosecutrix did "keep com-
pany" with McComb, and that Bally was her frequent com-
panion and sweetheart.   In another important matter the
prosecutrix was impeached.   She testified that prior to the
alleged assault the defendant "would never keep his hands
to himself;" that he would pinch her and·feel of her bosom,
and attempt to kiss her in the presence of his wife, and when
she would remonstrate with him, his wife would say:   "Oh,
you are too touchy."   In this she was contradicted not only
by defendant but also by defendant's wife.

     The defendant, in order to establish that prosecutrix was
not a female of "previous chaste character," introduced three
witnesses, Charles Dodd, John McComb and Ernest Bally,
who testified that they had had sexual intercourse with the
prosecutrix before June 7, 1899.   Each of them gave time,
place and circumstances under which the prosecutrix had sub-
mitted to their desires.   All three of them had resided near

Lake Contrary for a number of years. At the trial there was present a large number of representative citizens who had lived in the same vicinity for years—witnesses as to the reputation of the defendant—who must have known Dodd, McComb and Bally, yet no attempt was made by the State to attack the character or impeach the testimony of any of them; and their testimony is not contradicted except by the prosecutrix herself, who contented herself with the mere statement that she had never had sexual intercourse with any of them.

It is thought proper to give here some instances where the courts have held the evidence wholly wanting in the elements which go to make up the crime of rape. Thus in Topolanck v. State, 40 Tex. 160, the court said: "It would seem that the defendant was convicted alone on the testimony of the female alleged to have been injured, unsupported by other evidence, and not corroborated by circumstances. She says she told no one of what the defendant had done for several weeks, leaving it to be inferred that she had given information to some one after that time, but what it was is not disclosed. Whatever the disclosure may have been, or whoever may have been the party, that party is not named in her testimony, and not called as a witness to corroborate her statement. It was several weeks after the offense is said to have been committed, and long after she had opportunity to complain. No complaint is made until March 1, 1873, more than three months after the wrong is said to have been done, and about three months and a half before her child was born. Her long silence is perhaps intended to be explained when she says the defendant threatened her life and the life of her father if she told any one of what he had done. But it does not appear that she had any good reason for fear on account of such threats, if made. She was twenty-one years old, resided with her father and was under his protection. Though she was legally competent as a witness, these circumstances diminish the credit to be given to her testimony, and leave

the question of the defendant's guilt in so much doubt that the jury were not authorized to render any other verdict than that of not guilty. And though the court can not express any opinion as to the weight of the evidence, nor sum up the testimony on the trial before the jury, as they are the exclusive judges of the facts, yet, on a motion for a new trial, it is the duty of the court to set the verdict aside when it is contrary to the law and the evidence. [2 Whart. Crim. Law, 1149; 3 Greenl. Ev., 212; Pasch. Dig., arts. 3059, 3137, cause 9.]"

Commenting on the above case, HENDERSON, J., among other things, said: "In this case, however, instead of only three months elapsing between the alleged offense and the complaint made by the prosecutrix, more than seven months had elapsed, and only when her condition exposed her did she state anything in regard to the matter. This long silence and the circumstances under which she made the accusation should go very far to discredit her, and to suggest that the act of carnal intercourse, if it was with the defendant at all, was with her consent. The excuse she gives, that she feared the appellant would kill her father, under the circumstances of this case, must appear very flimsy, indeed. The appellant was shown not to live in the family, and not to have authority or control over her; and this statement of hers, as a reason for her long silence, does not comport with the integrity of a virtuous female, who has been outraged, and who is jealous of her honor. If we look to the circumstances of the outrage itself as narrated by her, they likewise appear shadowy. There was no attempt at flight, though she was on horseback. No evidence of any injury or struggle. She appears to have unresistingly submitted to being lifted from her horse, and, after the outrage was accomplished, to be lifted back again, by the destroyer of her innocence, to have accepted his escort to her home, and to have gone with him on two sleighrides a few days afterwards; and all this with-

out any suggestion that he had demeaned himself towards her in any other wise than in a manner which met her approval. Under all of the facts of this case, it occurs to us that the lower court should have unhesitatingly granted a new trial in this cause. Although a stricter rule prevails here with reference to a new trial than in the lower court, yet, from the record in this case, we can not permit this verdict to stand. Under the laws of this State, rape means 'the carnal knowledge of a woman, without her consent, obtained by force, and such force as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case.' And the proof of this must be made to appear beyond any reasonable doubt," citing cases. [Price v. State, 36 Tex. Cr. Rep. 143.]

In State v. Chapman, 88 Iowa 254, the indictment was for rape; verdict for assault with intent to commit rape. The prosecutrix was nineteen years of age, had known defendant for three years, and was going with him, on foot, to her home, about six miles distant. They were seen by two witnesses walking down the railroad track together. She testified that he proposed they go across the fields to make the route shorter. She hesitated, and finally consented. While crossing the fields, he made improper proposals to her. She walked away and left him. He called her back to talk further, and she came. He renewed his proposals. She refused. They bantered. He threw her down, and against her wishes had improper relations with her. She endeavored to free herself and escape. The court says: "Her failure afterwards to make known the occurrence until her delicate situation made it necessary to tell her mother . . . and her entire conduct before and after the affair, presents a state of facts so inconsistent with her forcible defilement, that we think the verdict without sufficient support."

In State v. Connelly, 57 Minn. 482, the defendant was

convicted of the crime of rape upon a girl of the age of seven-teen years.    The defendant was a priest, and resided in an adjoining house.    She testified that while she was on the porch of her own house the defendant called her over to give her some pictures to put in her prayerbook; that he took her upstairs into his bedroom; that he gave her some whisky, in which he put some stuff out of a little bottle; that she drank it, got weak, and began falling over a little; that he picked her up, and put her on the bed, and ravished her; that she resisted all she could, and hurrahed; that he accomplished his purpose by force; that he threatened to kill her if she told, and took his revolver from the bureau, and pointed it at her at the time.    This was March 9th.    She told no one until May 25th following.    The court says: "But the more vital ques-tion is whether the evidence was sufficient to warrant a con-viction.    There is no rule of law which forbids a jury to con-vict of rape on the uncorroborated evidence of the prosecu-trix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony.    The courts have always rec-ognized the danger of convicting on her uncorroborated evi-dence.    Where the testimony of the prosecutrix is uncorrob-orated, and bears some intrinsic evidence of improbability, courts have sometimes refused even to submit it to the jury."

In Territory v. Webb, 2 N. M. 147-157, it was ruled that "under the rules governing the judicial administration of the criminal laws of this Territory, this court can only review and determine errors of law appearing upon the face of the record.    It is quite beyond the scope of its duties to determine the credibility of witnesses testifying in the lower court, the weight of their testimony aside from the law of the evidence, or the reconciliation of conflicting testimony." But they have also held in the same case and in the same con-nection, that "cases, however, might arise wherein, though there might be some evidence to sustain every material alle-gation of the indictment, yet at the same time the evidence

might be so very slight as to justify an appellate court in reversing a judgment thereon." In Owens v. State, 35 Tex. 361, the court says: "Cases not infrequently come to this court where a new trial has been refused, when the weight of evidence is clearly against the verdict, or is so weak as to leave every correct and sound mind in doubt of the guilt of the accused. In all such cases the district court should grant a new trial, and unless this is done, this court will be compelled to relax its rules, and reverse every judgment which we find rendered on lame and unsupported verdicts."

In Mares v. Territory (N. M.), 65 Pac. Rep. 165, it was held that the disclosure of the assault made four months after its occurrence, was of no value whatever as a corroborating circumstance, and the court, speaking through McMILLAN, J., said: "There is not, in the whole case, any corroborating evidence, nor a single corroborating circumstance, and the probability of the commission of the alleged offense is so far outside of the domain of reason that there was absolutely nothing for the consideration of the jury except the bare improbable statement of the prosecutrix. It is not probable that an employee in a butcher shop, located on a busy thoroughfare, and having large windows, uncurtained, giving a full view of the shop, from the sidewalk, would, in the daytime, and at an hour of the day when people are accustomed to come to the shop to trade, assault and ravish a customer. It is not probable that a female twenty-two years of age, in such a place, while being pushed fifteen to eighteen feet towards an adjoining room, by a man about to ravish her, would not make an outcry, and resist, if she desired to protect her virtue. It is not probable that a woman of the mature age of the prosecutrix, who was with her mistress in the daytime and her mother at night, would allow such an assault to go uncomplained of to one or the other until she was ill from miscarriage, four months after the alleged occurrence, if she were an innocent victim. It is not probable that a female

having a miscarriage, and charged by her mother with wrong-
doing, would not lay the offense at the door of another to
shield herself. It is unnecessary to notice any of the errors
assigned against the verdict of conviction except the twenty-
first, to-wit 'The verdict is against the law,' and the twenty-
second, to-wit, 'The verdict is against the evidence,' it appear-
ing from the record that there is not sufficient evidence to
justify the conviction. The complaint made to her mother by
the prosecutrix four months after the alleged assault, and
wrung from her at a time when she was ill from miscarriage,
has no value whatever as a corroborating circumstance. 'A
disclosure in the case of rape has no value whatever unless
it is the natural result of the horror and sense of wrong which
would prompt any virtuous female to make an outcry at the
first suitable opportunity.' [People v. O'Sullivan, 104 N.
Y. 481.] In 1 Hale, P. C. 632, it is said: 'Complainant
must make fresh discovery and pursuit of the offender; other-
wise, it carries a presumption that her suit is but malicious
and feigned.' In 1 East P. C. 445, it is said that the evidence
of the complainant 'is confirmed if she presently discovered
the offense and made pursuit of the offender, and that her
evidence is discredited if she concealed the injury for any
considerable time after she had opportunity to complain.'"
And the judgment in that case was reversed. See also, Mon-
roe v. State, 13 So. Rep. 884. In that case the headnote is
as follows: On a trial for rape of an eleven-year-old girl,
the evidence relied on to convict was the testimony of the girl
herself. The alleged crime occurred at noon, at a farmhouse,
and no complaint was made to the neighbors; and there was
a horn at hand, generally blown as a signal of an unusual
occurrence, but not blown on the occasion of the alleged crime.
There was no sign of struggle, and no suggestion of any chok-
ing or blows to disable, and no tearing of the girl's clothes.
She stayed at home till night, and then told her brother of
the alleged rape, who said he was going "to tell ma," and she

State v. Hamey.

then went to meet her mother, and told her. Held insufficient to sustain a conviction. There, CAMPBELL, C. J., said: "No error was committed by the court in the trial of the case, but in our opinion the verdict should not be permitted to stand. It is true that conviction of this detestable crime may be had on the uncorroborated testimony of the person raped, but it should always be scrutinized with caution; and, where there is much in the facts and circumstances in evidence to discredit her testimony, it is not sufficient to sustain a verdict of guilty. [1 Hale P. C. 635, et seq.; Innis v. State, 42 Ga. 473; People v. Hulse, 3 Hill 309; 19 Amer. and Eng. Ency. Law, p. 958.] The observations of the court in People v. Hulse, 3 Hill 309, are just and appropriate, and commend themselves to our judgment. There is much in the testimony of the girl charged to have been raped by the accused to throw doubt on her testimony. There is not a single corroborating circumstance to support her statement, and much to suggest its falsity. . . . No sign of any struggle was shown. There was no suggestion of any choking or blows to disable, or bruising the arms or wrists, or tearing the clothes of the girl, or the bedclothes, or any circumstance, even the most trivial, to support her testimony. The rape occurred at 12 o'clock noon, and, although it was on a plantation, she made no complaint to any neighbor. Although there was a horn at hand, the blowing of which was a signal of something unusual having occurred at the house, it was not blown for this unusual occurrence. The girl waited at home until about night, when, having told her little brother, she says, who said he was going 'to tell ma,' she went to meet her mother, and told her. The strong probability is that the account of the affair given by accused is correct, and that the girl consented, and having been detected by the little brother, or from some other cause, she determined to tell. We regard her testimony as incredible." [See also, Huber v. State, 126 Ind. 185; State v.

State v. Hamey.

Wilson, 91 Mo. 410; State v. Patrick, 107 Mo. 147, and cas. cit.]

Acting in the light of these authorities and, indeed, of the experience of common life and of the ordinary instincts and promptings of human nature, we hold that a verdict based on such evidence as above offered by the State, should not be permitted to stand; that evidence is contrary to all rational belief and all prior observations of human action in like circumstances.

But even if rape were proven in the present instance, as *that is not the crime charged in the indictment,* for that very reason no verdict under section 1838 should be permitted to stand. Summarizing the foregoing rulings we hold, first, section 1838 unconstitutional; second, that a man indicted and tried under section 1838, proved guilty under section 1837, can not be convicted under section 1838, unless his right under section 22 of the Bill of Rights to be notified by the indictment of "the nature and cause of the accusation" against him, is wholly disregarded; third, that no man should be convicted of rape on such improbable, discredited and unreasonable evidence as that offered by prosecutrix.

For these reasons the judgment should be reversed and defendant discharged. [Sec. 2718, R. S. 1899.]

The foregoing which, with some few things added, was the opinion of Division Two, *Burgess, J.,* concurring therein, *Gantt, J.,* dissenting, has ceased to be the opinion of the court, and because of this I herewith file the original as my dissenting opinion, in which *Marshall, J.,* concurs.